263 F.3d 1369 (Fed. Cir. 2001)
 SKF USA INC., SKF FRANCE S.A., SARMA, SKF GmbH, SKF INDUSTRIE S.p.A., and SKF SVERIGE AB, Plaintiffs-Appellants,
v.
UNITED STATES, Defendant-Appellee,
and
THE TORRINGTON COMPANY, Defendant-Appellee.
FAG KUGELFISCHER GEORG SCHAFER AG, FAG ITALIA S.p.A., BARDEN CORPORATION (U.K.) LTD., FAG BEARINGS CORPORATION, and THE BARDEN CORPORATION, Plaintiffs-Appellants,
v.
UNITED STATES Defendant-Appellee,
and
THE TORRINGTON COMPANY, Defendant-Appellee.
 Nos. 00-1423, 00-1465
 United States Court of Appeals for the Federal Circuit
 AUGUST 24, 2001
 
 Appealed from: United States Court of International Trade [Copyrighted Material Omitted]
 Herbert C. Shelley, Steptoe & Johnson LLP, of Washington, DC, argued for plaintiffs-appellants in 00-1423, SKF USA Inc., et al. Of counsel was Alice A. Kipel.
 Max F. Schutzman, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, New York, argued for plaintiffs-appellants in 00-1465, the Barden Corporation, et al. With him on the brief were Andrew B. Schroth, and Mark E. Pardo. Of counsel was Adam M. Dambrov. Also of counsel was Jeffrey S. Grimson , of Washington, DC.
 Velta A. Melnbrencis, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant-appellee in 00-1423 and 00-1465, United States. With her on the brief was David M. Cohen, Director. Of counsel on the brief were John D. McInerney, Acting Chief Counsel for Import Administration, U.S. Department of Commerce, Berniece A. Browne, Senior Counsel, and David R. Mason.
 Geert De Prest, Stewart and Stewart, of Washington, DC, argued for defendant-appellee in 00-1423 and 00-1465, the Torrington Company. With him on the brief was Terence P. Stewart. Of counsel were Wesley K. Caine, and Lane S. Hurewitz.
 Before MICHEL, SCHALL, and DYK, Circuit Judges.
 DYK, Circuit Judge.
 
 
 1
 These consolidated cases present the question whether the Department of Commerce ("Commerce") properly calculated the profit component of a constructed value determination under 19 U.S.C. 1677b(e)(2)(A). In each of these two cases, the Court of International Trade sustained Commerce's methodology. We hold that Commerce has failed to adequately explain why it has interpreted the phrase "foreign like product" differently in 19 U.S.C. 1677b(a)(1) and 1677(e). We accordingly vacate the decisions of the Court of International Trade in FAG Kugelfischer v. United States, No. 99-08-00465 (Ct. Int'l Trade July 7, 2000), and SKF USA Inc. v. United States, No. 98-07-02540 (Ct. Int'l Trade June 1, 2000) and remand for further proceedings.
 
 STATUTORY BACKGROUND
 
 2
 The antidumping statute, as amended by the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994) ("URAA"), governs this appeal. Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995).
 
 
 3
 Under the antidumping statute, Commerce is required to impose antidumping duties on "subject merchandise"[1] that "is being, or is likely to be, sold in the United States at less than its fair value" to the detriment of a domestic industry. 19 U.S.C. 1673. To determine whether antidumping duties should be imposed, Commerce must make a "fair comparison," 19 U.S.C. 1677b(a), between the price charged for the subject merchandise in the United States (the "United States price")[2] and the price charged for the corresponding foreign like product in the home market (the "normal value"). 19 U.S.C. 1677b(a) (emphasis added). In order to make the comparison, Commerce must identify the "foreign like product."
 
 
 4
 The Determination of "Normal Value"
 
 
 5
 In determining normal value, Commerce must use an actual exporting country "price" for the foreign like product, if a satisfactory price is available. The antidumping statute defines that price in pertinent part as:
 
 
 6
 [T]he price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as [the United States price].
 
 
 7
 19 U.S.C. 1677b(a)(1)(B)(i). That price must be in effect "at a time reasonably corresponding to the time of the sale used to determine" the United States price. 19 U.S.C. 1677b(a)(1)(A).
 
 
 8
 If, however, no satisfactory exporting country price is available, Commerce may base normal value (subject to certain requirements not at issue) on sales "price" in a third-country market, that is, "the price at which the foreign like product is so sold (or offered for sale) for consumption in a country other than the exporting country or the United States . . . ." 19 U.S.C. 1677b(a)(1)(B)(ii).
 
 
 9
 Alternatively, if no satisfactory exporting country price is available, and "notwithstanding" the existence of sales in a third-country market, "the normal value of the subject merchandise may be the constructed value of that merchandise . . . ." 19 U.S.C. 1677b(a)(4). In other words, Commerce may elect to use "constructed value" if no satisfactory exporting country price is available. This constructed value is not an actual price at which the merchandise is offered for sale. Rather, as the Statement of Administrative Action ("SAA") accompanying the URAA makes clear, this "constructed value serves as a proxy for a sales price" of the subject merchandise in the home market. H.R. Doc. 103-316, at 839 (1994), reprinted in 1994 U.S.C.C.A.N. 3773, 4175.[3] The antidumping statute provides in pertinent part that "the constructed value of imported merchandise shall be an amount equal to the sum of" the following three amounts: (1) the "the cost of materials and fabrication" of the merchandise. 19 U.S.C. 1677b(e)(1); (2) the "cost of all containers and coverings . . . and all other expenses incidental" to packaging the merchandise for shipment to the United States. 19 U.S.C. 1677b(e)(3); and (3) the "actual amounts incurred and realized . . . for selling, general, and administrative expenses, and for profits," (hereinafter "profit"). 19 U.S.C. 1677b(e)(2)(A)-(B) (emphasis added). In accordance with the statute, Commerce computes this constructed value for the imported merchandise "based on the cost of manufacture, selling general and administrative expenses, and profit" of that merchandise. 19 C.F.R. 351.405(a).
 
 
 10
 It is Commerce's methodology for the calculation of the profit component of constructed value that is at issue. This calculation is particularly complex, as Congress has provided four separate calculational methodologies.
 
 
 11
 The first methodology refers to profit realized "in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country . . . ." 19 U.S.C. 1677b(e)(2)(A). This is the preferred methodology for the constructed value calculation. If, however, "actual data are not available with respect to the amounts" prescribed in subsection (2)(A),[4] Congress has authorized Commerce to use any one of three other methodologies. The SAA provides in pertinent part that section 1677b(e)(2)(B) "does not establish a hierarchy or preference among these alternative methods." SAA at 840, reprinted in 1994 U.S.C.C.A.N. at 4176. The three methodologies are set forth in section 1677b(e)(2)(B), which provides in pertinent part that constructed value shall be equal to the sum of:
 
 
 12
 (i) the actual amounts incurred and realized by the specific exporter or producer . . . for selling, general, and administrative expenses, and for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise, [or]
 
 
 13
 (ii) the weighted average of the actual amounts incurred and realized by exporters or producers . . . for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or
 
 
 14
 (iii) the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers . . . in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise.
 
 
 15
 19 U.S.C. 1677b(e)(2)(B).
 
 
 16
 It will be noted that the methodologies set forth in subsections (2)(A) and (2)(B)(ii) of section 1677b(e) refer to profit realized "in connection with the production and sale of a foreign like product," the same terminology used in the price provisions. (Emphasis added). As we discuss below, the statute in turn specifically defines "foreign like product" in 19 U.S.C. 1677(16). It is the definition of "foreign like product" used by Commerce for purposes of these calculational methodologies that is challenged here.
 
 FACTUAL BACKGROUND
 
 17
 The two proceedings at issue involve the determination of antidumping duties for imports of anti-friction bearings ("AFBs")[5] from a number of countries, including France, Germany, Italy, Sweden, and the United Kingdom. Appellants SKF USA Inc., SKF France S.A., Sarma, SKF GmbH, SKF Industrie S.p.A., and SKF Sverige AB (collectively, "SKF") challenge the final results of Commerce's administrative review of antidumping duty orders on AFBs covering the period from May 1, 1996, through April 30, 1997. Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al.; Final Results of Antidumping Duty Administrative Reviews, 63 Fed. Reg. 33,320 (June 18, 1999) ("SKF Final Results"). Appellants FAG Kugelfischer Georg Schafer AG, FAG Italia S.p.A., Barden Corporation (U.K.) Ltd., FAG Bearings Corporation and The Barden Corporation (collectively, "FAG") challenge the final results of Commerce's administrative review of antidumping duty orders on AFBs covering the period from May 1, 1997, through April 30, 1998. Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al.; Final Results of Antidumping Duty Administrative Reviews, 64 Fed. Reg. 35,590 (July 1, 1999) ("FAG Final Results").
 
 
 18
 "[T]he AFB market is comprised of literally thousands of different bearing models . . . ." Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al., 57 Fed. Reg. 28,360, 28,366 (June 24, 1992). The sheer number of different bearing models accordingly creates a highly complex market for AFBs. To take this complexity into account, Commerce groups specific models of AFBs into "families" when assessing dumping duties or conducting administrative reviews of those dumping determinations.[6] Commerce defines each family of AFBs, in turn, by a minimum set of matching physical characteristics shared by one or more particular AFB models.[7]
 
 
 19
 In the administrative reviews at issue, Commerce first sought to ascertain normal value for the AFBs using the price-based method set forth in section 1677b(a)(1)(B)(i). In making this determination, Commerce included within the ambit of the term "foreign like product" only sales of identical AFBs and sales of AFBs from the same family. In both reviews, Commerce concluded that "there were no usable sales of the foreign like product in the comparison market" during the relevant time period to determine "price" for normal value purposes. SKF Preliminary Results, 63 Fed. Reg. at 6,516; FAG Preliminary Results, 64 Fed. Reg. at 8,795.[8] As authorized by section 1677b(a)(4),[9] Commerce therefore turned to section 1677b(e)(2)(A) to calculate a "constructed value" for those AFBs.
 
 
 20
 It might seem obvious that the same definition of "foreign like product" would be used in making both the price-based calculations for normal value prescribed under 19 U.S.C. 1677b(a)(1), and also in calculating constructed value under 19 U.S.C. 1677b(e). But in these cases Commerce did not do so. Instead Commerce used a different definition of "foreign like product" in making the constructed value determination than it had in the price determination, and aggregated "all foreign like products under consideration for normal value" in the constructed value calculation. SKF Final Results, 63 Fed. Reg. at 63,333; FAG Final Results, 64 Fed. Reg. at 35,610. In other words, in defining "foreign like product" for purposes of the price-based calculations for normal value, Commerce included only sales of identical AFBs and sales of AFBs from the same family. But in defining "foreign like product" for purposes of the constructed value calculation, Commerce included sales of AFB's from families other than the single family of AFBs used for the price-based calculations for normal value.
 
 
 21
 If Commerce had used the same definition of "foreign like product" for purposes of the constructed value calculation as in the price calculation, Commerce, having found that "there were no usable sales"[10] of identical and same-family AFBs in the home market for purposes of the price calculation under 19 U.S.C. 1677b(a)(1)(B)(i), would have to make that same finding for the constructed value calculation under 19 U.S.C. 1677b(e)(2)(A).[11] Commerce would then be required to use one of the methodologies set forth in 19 U.S.C. 1677b(e)(2)(B) to make that profit calculation.
 
 
 22
 Use of the methodologies set forth in subsections (B)(i) and (B)(iii) of section 1677b(e)(2), of course, would require the inclusion of below-cost sales in the constructed value profit calculation. This is so because those methodologies do not require that the sales be made "in the ordinary course of trade." In contrast, the sales included in the calculations set forth in subsections (A) and (B)(ii) of section 1677b(e)(2) must be in "the ordinary course of trade," which excludes below cost sales. The SAA makes clear, for example, that when Commerce uses the methodology set forth in subsection (A), it "may ignore sales that it disregards as a basis for normal value, such as those disregarded because they are made at below-cost prices." SAA at 839, reprinted in 1994 U.S.C.C.A.N. at 4175-76.[12] Similarly, the SAA instructs that use of the methodology set forth in subsection (B)(ii) "requires the use of sales in the ordinary course of trade, i.e., profitable sales." Id. at 840, reprinted in 1994 U.S.C.C.A.N. at 4176. The inclusion of below-cost sales would lower the profit calculation, reduce the constructed value and ultimately benefit the exporter by reducing the amount of the dumping margin (and the amount of any assessed dumping duties).
 
 
 23
 In the Final Results for both administrative reviews, Commerce defended its use of the broader definition of "foreign like product" when calculating the profit component of constructed value as a "reasonable interpretation" of 19 U.S.C. 1677b(e)(2)(A). Quoting from the preamble to its regulation on the calculation of constructed value, 19 C.F.R. 351.405, Commerce stated in pertinent part that:
 
 
 24
 [W]e believe that an aggregate calculation that encompasses all foreign like products under consideration for normal value represents a reasonable interpretation of [19 U.S.C. 1677b(e)(2)(A)]. Moreover, we believe that, in applying the preferred method for computing [constructed value] profit under [19 U.S.C. 1677b(e)(2)(A)], the use of aggregate data results in a reasonable and practical measure of profit that we can apply consistently in each case. By contrast, a method based on varied groups of foreign like products, each defined by a minimum set of matching criteria shared with a particular model of the subject merchandise, would add an additional layer of complexity and uncertainty to antidumping duty proceedings without necessarily generating more accurate results.
 
 
 25
 SKF Final Results, 63 Fed. Reg. at 33,333; FAG Final Results, 64 Fed. Reg. at 35,611.
 
 
 26
 SKF and FAG separately challenged these determinations before the Court of International Trade. In those challenges, SKF and FAG argued, inter alia, that Commerce's use of aggregate data in calculating constructed value profit - i.e., Commerce's broad definition of the term "foreign like product" for purposes of that calculation - contravened the specific definition of "foreign like product" contained in 19 U.S.C. 1677(16), a provision we discuss in detail below. In particular, they argued that section 1677(16) obligated Commerce to first attempt to locate "identical" or "like" merchandise before using aggregated data for the constructed value profit calculation.
 
 
 27
 The Court of International Trade disagreed, and upheld Commerce's methodology for the calculation of constructed value profit. In reaching this decision, that court relied on the holding and reasoning of its earlier decision in RHP Bearings, Ltd. v. United States, 83 F. Supp. 2d 1322 (Ct. Int'l Trade 1999).
 
 
 28
 In RHP Bearings, the court examined the definition of "foreign like product" used by Commerce when calculating constructed value to determine whether it comported with any of the definitions of "foreign like product" set forth in section 1677(16). The court found that Commerce's use of "aggregate data [for the calculation of constructed value profit] matches the criteria of 1677(16)(C)'s 'same general class or kind' category. . . ." 83 F. Supp. 2d at 1336. In other words, the court found that the definition of "foreign like product" used by Commerce when calculating the profit component of constructed value "matched" the definition of "foreign like product" set forth in 19 U.S.C. 1677(16)(C). Thus, the court determined that "Commerce's determination under 19 U.S.C. 1677b(e)(2)(A) was in accordance with law." Id.
 
 
 29
 SKF and FAG timely appealed to this court, and following oral argument we consolidated these cases for purposes of decision.
 
 DISCUSSION
 
 30
 * This court has jurisdiction over this appeal pursuant to 28 U.S.C. 1295(a)(5). "When reviewing anti-dumping determinations made by Commerce, this court applies anew the standard of review applied by the Court of International Trade in its review of the administrative record." F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1031 (Fed. Cir. 2000). In doing so, we uphold Commerce's determination unless it is "unsupported by substantial evidence on the record or otherwise not in accordance with law." 19 U.S.C. 1516a(b)(1)(B)(i).
 
 
 31
 We review questions of statutory interpretation without deference. U.S. Steel Group v. United States, 225 F.3d 1284, 1286 (Fed. Cir. 2000). In reviewing an agency's construction of a statute that it administers, this court addresses two questions as required by the Supreme Court's decision in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984). The first question is "whether Congress has directly spoken to the precise question at issue." Id. at 842. If so, this court and the agency "must give effect to the unambiguously expressed intent of Congress." Id. at 843. If, however, Congress has not spoken directly on the issue, this court addresses the second question of whether the agency responsible for filling a gap in the statute has rendered an interpretation that "is based on a permissible construction of the statute." Id.; see also United States v. Mead Corp., 121 S. Ct. 2164, 2185 (2001); Micron Tech., Inc. v. United States, 243 F.3d 1301, 1308 (Fed. Cir. 2001). In other words, Commerce's interpretation will not be set aside unless it is "arbitrary, capricious, or manifestly contrary to the statute." Chevron, 467 U.S. at 844.
 
 
 32
 In antidumping cases, this court has previously recognized "Commerce's special expertise," and it has "accord[ed] substantial deference to its construction of pertinent statutes." Micron Tech., Inc. v. United States, 117 F.3d 1386, 1394 (Fed. Cir. 1997).
 
 II
 
 33
 The central question here is whether Commerce (when making price-based calculations for normal value) may define "foreign like product" to include only identical AFBs and AFBs from the same family, but then (when calculating constructed value) may define "foreign like product" to include aggregate data on AFBs from different families.
 
 
 34
 The antidumping statute specifically defines "foreign like product." Section 1677(16) of the statute defines "foreign like product" as:
 
 
 35
 [M]erchandise in the first of the following categories in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made:
 
 
 36
 (A) The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.
 
 
 37
 (B) Merchandise--
 
 
 38
 (i) produced in the same country and by the same person as the subject merchandise,
 
 
 39
 (ii) like that merchandise in component material or materials and in the purposes for which used, and
 
 
 40
 (iii) approximately equal in commercial value to that merchandise.
 
 
 41
 (C) Merchandise--
 
 
 42
 (i) produced in the same country and by the same person and of the same general class or kind as the subject merchandise,
 
 
 43
 (ii) like that merchandise in the purposes for which used, and
 
 
 44
 (iii) which the administering authority determines may reasonably be compared with that merchandise.
 
 
 45
 19 U.S.C. 1677(16). Commerce in argument before this court appeared to be uncertain whether subsection (16) of section 1677 applied to those constructed value provisions, specifically, 19 U.S.C. 1677b(e)(2)(A)-(B).
 
 
 46
 The source of the confusion is that the statute provides that the definition of "foreign like product" set forth in section 1677(16) is to be used for purposes of "part II" of subtitle IV of the statute. That part of the statute, entitled "Imposition of Antidumping Duties," prescribes procedures for the initiation of antidumping duty investigations and the assessment of dumping duties. But section 1677b appears in part IV of subtitle IV of the statute, entitled "General Provisions." In other words, the definition of "foreign like product" set forth in 19 U.S.C. 1677(16) would seem not to apply to the term when used in section 1677b, and thus would seem not to apply to either the price-based calculations for normal value, or to the calculations for the computation of constructed value.
 
 
 47
 This seeming anomaly is easily resolved. The term "foreign like product" does not appear at all in part II of subtitle IV of the statute. Again, part II requires Commerce to determine in the first instance whether dumping has occurred and, if so, to calculate the amount of the dumping duty. Congress obviously contemplated that in doing so Commerce would use the calculational methodologies for normal value (or constructed value) of part IV, where the term "foreign like product" is used. While it might have been better for Congress to refer specifically to part IV in 19 U.S.C. 1677(16), its reference to part II was obviously designed to require that Commerce use the definition in making the part IV calculation for purposes of part II. However, given the complexity of the statutory definition of the term "foreign like product," this does no more than provide the framework for our analysis.
 
 
 48
 The parties challenging the definition of "foreign like product" used by Commerce when calculating constructed value profit make a number of unconvincing arguments in suggesting that the language of the statute bars Commerce from aggregating more than one product in the category of "foreign like product."[13] Indeed, the definition of "foreign like product" set forth in 19 U.S.C. 1677(16)(C) makes clear that Commerce may use aggregate data relating to merchandise that is "of the same general class or kind as the subject merchandise." 19 U.S.C. 1677(16)(C).
 
 
 49
 Nonetheless, appellants' main argument is substantial. Although the statutory definition of "foreign like product" is ambiguous in many respects, and Commerce certainly has an important role in resolving those ambiguities and considerable discretion in defining "foreign like product,"[14] its discretion is not absolute. The question here is whether Commerce can utilize different definitions for determining "price" (as is required when determining normal value under 19 U.S.C. 1677b(a)(1)) and "profit" (for calculation of constructed value under 19 U.S.C. 1677b(e)).
 
 
 50
 The appellants' arguments may be summarized as follows. When Congress uses a technical term in a statute, it is presumed that it has intended that the term have the same meaning in each of the sections or subsections. In Gustafson v. Alloyd Co., Inc., 513 U.S. 561 (1995), for example, the Supreme Court concluded that the term "prospectus," which it characterized as a "term of art" in the securities industry, id. at 576, had the same meaning under two different sections of the Securities Act of 1933. In reaching that conclusion, the Court relied on "the 'normal rule of statutory construction' that 'identical words used in different parts of the same act are intended to have the same meaning.'" Id. at 570 (quoting Dep't of Revenue of Ore. v. ACF Indus., Inc., 510 U.S. 332, 342 (1994)).[15] This "normal rule of statutory construction" applies with particular force where Congress has specifically defined the term. In Sorenson v. Treasury, 475 U.S. 851 (1986), for example, the Supreme Court rejected a taxpayer's argument that the definition of the term "overpayment" in one section of the Internal Revenue Code did not apply to the use of the term in a separate but related code section. In reaching this conclusion, the Supreme Court reasoned, in pertinent part, that:
 
 
 51
 The normal rule of statutory construction assumes that "identical words used in different parts of the same act are intended to have the same meaning." That the Internal Revenue Code includes an explicit definition of "overpayment" in the same subchapter strengthens the presumption. And that both subsections concern the tax-refund treatment of "[overpayments]" is especially damaging to any claim that "the words, though in the same act, are found in such dissimilar connections as to warrant the conclusion that they were employed in the different parts of the act with different intent."
 
 
 52
 Id. at 860 (internal citations omitted) (emphasis added) (brackets in original).
 
 
 53
 In the antidumping statute Congress has used the term "foreign like product" in various sections, and has specifically defined it in 19 U.S.C. 1677(16). We therefore presume that Congress intended that the term have the same meaning in each of the pertinent sections or subsections of the statute, and we presume that Congress intended that Commerce, in defining the term, would define it consistently. Without an explanation sufficient to rebut this presumption, Commerce cannot give the term "foreign like product" a different definition (at least in the same proceeding) when making the price determination and in making the constructed value determination. This is particularly so because the two provisions are directed to the same calculation, namely, the computation of normal value (or its proxy, constructed value) of the subject merchandise.
 
 
 54
 Commerce's response to appellants' argument is not persuasive. The agency spends most of its effort arguing that the aggregated definition of "foreign like product" it uses when calculating constructed value profit is a reasonable interpretation of 19 U.S.C. 1677b(e) and that we should accordingly defer to that reasonable interpretation under Chevron. Save for Commerce's use of different definitions of "foreign like product," Commerce might well be correct. But that does not explain why Commerce used different definitions when making the price-based calculations for normal value prescribed under 19 U.S.C. 1677b(a)(1) and when calculating constructed value under 19 U.S.C. 1677b(e). Even on this appeal Commerce has offered no justification for its use of different definitions of "foreign like product" for price purposes and when calculating constructed value.
 
 
 55
 Commerce is required to explain why it uses different definitions of "foreign like product" for price purposes and when calculating constructed value, and that explanation must be reasonable. As the District of Columbia Circuit has noted, it is well-established that "an agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently." Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C. Cir. 1996). In a recent decision, we specifically held that the Department of Veterans Affairs was required to explain why two of its regulations had interpreted virtually identical language contained in related veterans' benefits statutes in conflicting ways. Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs, 260 F.3d 1365 (Fed. Cir. Aug. 16, 2001). We accordingly vacate the decisions below and remand for further proceedings so that Commerce may attempt to better explain its approach.
 
 
 56
 In doing so, it will be necessary for Commerce to explain the factual settings for the calculations at issue, and explain exactly how those calculations are made. The antidumping statute is highly complex and often confusing, and we accordingly rely on Commerce in its antidumping determinations to make sense of that statute. The more complex the statute, the greater the obligation on the agency to explain its position with clarity. If the Court of International Trade and this court are to play their statutorily required roles in reviewing Commerce's determinations, it is important that we have clear guidance from Commerce as to what is actually happening.
 
 
 57
 Once Commerce explains its actual methodology for the calculation of constructed value profit, it should explain why its methodology comports with the statute. In doing so, Commerce must carefully consider the intersection of that methodology with the definitions of "foreign like product" in 19 U.S.C. 1677(16), and particularly the definition in subsection (C). It may be that Commerce cannot justify using different definitions of the term "foreign like product" in applying different parts of the statute, but it may be that it can do so.[16] Indeed, there have been rare occasions when the Supreme Court itself has construed the same term differently in different sections of the same statute. See Dewsnup v. Timm, 502 U.S. 410, 417 (1992).
 
 CONCLUSION
 
 58
 For the foregoing reasons, the decisions of the Court of International Trade in the consolidated cases are vacated and remanded for further proceedings consistent with this opinion.
 
 
 59
 VACATED AND REMANDED.
 
 COSTS
 
 60
 No costs.
 
 
 
 Notes:
 
 
 [1]
 The antidumping statute defines "subject merchandise" in pertinent part as "the class or kind of merchandise that is within the scope of an [antidumping] investigation, a review, a suspension agreement, an order under this subtitle or section 1303 of this title, or a finding under the Antidumping Act, 1921." 19 U.S.C. 1677(25).
 
 
 [2]
 The United States price is calculated by using one of two statutorily-prescribed methodologies - export price ("EP") or constructed export price ("CEP"). 19 U.S.C. 1677a(a)-(b); see also 19 U.S.C. 1677(35)(A). "[W]here a sale is made by a foreign producer or exporter to an affiliated purchaser in the United States, the statute provides for use of CEP as the United States price . . . ." Micron Tech., Inc. v. United States, 243 F.3d 1301, 1303 (Fed. Cir. 2001).
 
 
 [3]
 The SAA further provides in pertinent part that "constructed value is used as the basis for normal value where home market sales of the merchandise in question are either nonexistent, in inadequate numbers, or inappropriate to serve as a benchmark for a fair price, such as where sales are disregarded because they are sold at below-cost prices." H.R. Doc. No. 103-316, at 839 (1994), reprinted in 1994 U.S.C.C.A.N. at 4175.
 The SAA, of course, is more than mere legislative history. Congress has instructed that "[t]he statement of administrative action approved by the Congress under [19 U.S.C. 3511(a)] shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. 3512(d).
 
 
 [4]
 The SAA states, in pertinent part, that that this would occur "either because there are no home market sales of the foreign like product or because all such sales are at below-cost prices." SAA at 840, reprinted in 1994 U.S.C.C.A.N. at 4176.
 
 
 [5]
 In both proceedings, the AFBs at issue included ball bearings, cylindrical roller bearings, spherical plain bearings, and corresponding parts.
 
 
 [6]
 See, e.g., Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof from France, et al.: Final Results of Antidumping Duty Administrative Reviews, 57 Fed. Reg. 28,360, 28,366 (June 24, 1992) ("Second Review Final Results") (noting in pertinent part that the grouping of specific models of AFBs into families "was specifically designed to take into account the salient characteristics of the AFB market. . . .").
 
 
 [7]
 In the preliminary results for both administrative reviews at issue, for example, Commerce defined a "family" of AFBs as follows:
 As defined in the questionnaire [sent to SKF and FAG], a bearing family consists of all bearings within a class or kind of merchandise that are the same in the following physical characteristics: load direction, bearing design, number of rows of rolling elements, precision rating, dynamic load rating, outer diameter, inner diameter, and width.
 Antifriction Bearings (Other Than Tapered Roller Bearings) And Parts Thereof From France, et al.; Notice of Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews, 63 Fed. Reg. 6512, 6516 (Feb. 9, 1998) ("SKF Preliminary Results"); Antifriction Bearings (Other Than Tapered Roller Bearings) And Parts Thereof From France, et al.; Notice of Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews, 64 Fed. Reg. 8,790, 8,795 (Feb. 23, 1999) ("FAG Preliminary Results").
 
 
 [8]
 We understand the phrase "usable sales" to refer to sales of identical AFBs or AFBs of the same family that were made in the ordinary course of trade. The SAA, for example, emphasizes that Commerce, when determining an actual exporting country price, must "use above-cost sales if they exist, and if such sales are otherwise in the ordinary course of trade. Only if there are no above-cost sales in the ordinary course of trade in the foreign market under consideration will Commerce resort to constructed value." SAA at 833, reprinted in 1994 U.S.C.C.A.N. at 4170-71 (emphasis in original).
 Indeed, the agency has previously stated that when it makes price-based calculations for normal value (in administrative reviews of antidumping duty orders on AFBS), it "resort[s] to constructed value only when there [are] no sales of identical or family bearing models to match to the merchandise sold in the United States." Second Review Final Results, 57 Fed. Reg. at 28,366.
 
 
 [9]
 That subsection provides, in pertinent part, that:
 If the administering authority determines that the normal value of the subject merchandise cannot be determined under [19 U.S.C. 1677b(1)(b)(i)], then, notwithstanding [19 U.S.C. 1677b(1)(b)(ii)], the normal value of the subject merchandise may be the constructed value of that merchandise, as determined under subsection (e) of this section.
 19 U.S.C. 1677b(a)(4).
 
 
 [10]
 SKF Preliminary Results, 63 Fed. Reg. at 6,516; FAG Preliminary Results, 64 Fed. Reg. at 8,795.
 
 
 [11]
 This is so because (as we note above) the SAA instructs that "[o]nly if there are no above-cost sales in the ordinary course of trade in the foreign market under consideration will Commerce resort to constructed value." SAA at 833, reprinted in 1994 U.S.C.C.A.N. at 4170-71. And constructed value in turn merely "serves as a proxy for a sales price." Id. at 839, reprinted in 1994 U.S.C.C.A.N. at 4175. Thus, if "there are no above-cost sales in the ordinary course of trade" when making the price calculation, that must also be true when making the constructed value calculation.
 
 
 [12]
 The SAA further provides that "[o]ther examples of sales that Commerce could consider to be outside the ordinary course of trade include sales of off-quality merchandise, sales to related parties at non-arm's length prices, and sales with abnormally high profits." SAA at 839-40, reprinted in 1994 U.S.C.C.A.N. at 4176.
 
 
 [13]
 Appellants note, for example, that 19 U.S.C. 1677b(e)(2)(A) refers to profit realized "in connection with the production and sale of a foreign like product." (Emphasis added). The statute's reference to "a" foreign like product, appellants urge, bars Commerce from aggregating "all" foreign like products when calculating constructed value profits. We do not agree, even though Commerce has admitted that the phrase "a foreign like product" "arguably could be interpreted to mean a particular model" of AFB. Proposed Rules, 61 Fed. Reg. 7,308, 7,335 (Feb. 27, 1996). The use of the modifier "a" tells us nothing about what is included within the term "foreign like product." In any event, the United States Code instructs us that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise, . . . words importing the singular include and apply to several persons, parties or things." 1 U.S.C. 1. The "context" of section 1677b(e)(2)(A) does not indicate any intent of Congress to restrict the profit calculation to any single product.
 Appellants also note that the phrase "aggregate quantity" is not found in section 1677b(e)(2)(A), but that that phrase is used to modify the term "foreign like product" in 19 U.S.C. 1677b(a)(1)(C). They accordingly argue that Congress' failure to include the phrase "aggregate quantity" in section 1677b(e)(2)(A) bars Commerce from using aggregate data to determine "foreign like product."
 We do not agree. It is, of course, "well established that where Congress has included specific language in one section of a statute but has omitted it from another, related section of the same Act, it is generally presumed that Congress intended the omission." Ad Hoc Comm. v. United States, 13 F.3d 398, 401 (Fed. Cir. 1994) (citing Russello v. United States, 464 U.S. 16, 23 (1983)). But the mere presence of the descriptive phrase "aggregate quantity" in section 1677b(a)(1)(C) to modify the term "foreign like product" does not compel the conclusion that Congress intended to bar Commerce from using aggregate data to determine "foreign like product."
 Appellants next argue that Commerce's use of aggregate data when using the preferred methodology ( 1677b(e)(2)(A)), is contrary to Congressional intent. Appellants note that that methodology uses the term "foreign like product," while the first alternative methodology ( 1677b(e)(2)(B)(i)) uses the term "general category of products." And appellants point to the SAA, which states in pertinent part that "[t]he term 'general category of merchandise' encompasses a category of merchandise broader than the 'foreign like product.'" SAA at 840, reprinted in 1994 U.S.C.C.A.N. at 4176. Thus, urge appellants, the preferred methodology is meant to encompass a narrower range of merchandise than the first alternative methodology, which precludes Commerce's use of aggregate data under the preferred methodology. The SAA does appear to require that the (B)(i) methodology "encompass a category of merchandise broader" than that used in the preferred methodology of 1677b(e)(2)(A). But that hardly precludes Commerce from using aggregate data when calculating constructed value under the preferred methodology. There has been no showing here that Commerce has conflated "foreign like product" with "general category of products."
 
 
 [14]
 Even where Commerce has not engaged in notice-and-comment rulemaking, its statutory interpretations articulated in the course of antidumping proceedings draw Chevron deference. See United States v. Mead Corp., 121 S. Ct. 2164, 2171 (2001) (holding that an "[a]dministrative interpretation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority"); Am. Silicon Techs. v. United States, No. 00-1400, 2001 WL 922432, at *5 (Fed. Cir. Aug. 16, 2001).
 
 
 [15]
 See also, e.g., Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 479 (1992) (noting the "basic canon of statutory construction that identical terms within an Act bear the same meaning"); Sullivan v. Stroop, 496 U.S. 478, 484 (1990) (reaffirming the presumption that "identical words used in different parts of the same act are intended to have the same meaning"); but cf. United States v. Cleveland Indians Baseball Co., 121 S. Ct. 1433, 1441 (2001) ("Although we generally presume that identical words used in different parts of the same act are intended to have the same meaning, the presumption is not rigid, and the meaning [of the same words] well may vary to meet the purposes of the law.") (internal quotations and citations omitted) (brackets in original).
 
 
 [16]
 See, e.g., Nat'l Ass'n of Cas. & Sur. Agents v. Bd. of Governors of the Fed. Reserve Sys., 856 F.2d 282, 287 (D.C. Cir. 1988) (upholding different agency interpretations of same phrase when based on reasonable explanation), cert. denied, 490 U.S. 1090 (1989); Common Cause v. FEC, 842 F.2d 436, 441-42 (D.C. Cir. 1988) (where agency provides a reasonable explanation for interpreting the word "name" differently in separate sections of same statute, its construction is upheld).