# United States Court of Appeals for the Federal Circuit

04-1223


NSK LTD. and NSK CORPORATION,

                                                            Plaintiffs-Appellants,
                                    and

NTN CORPORATION, NTN BEARING CORPORATION OF AMERICA,
AMERICAN NTN BEARING MANUFACTURING CORPORATION,
NTN DRIVESHAFT, INC., and NTN-BOWER CORPORATION,

                                                            Plaintiffs,

                                    v.

UNITED STATES,

                                                            Defendant-Appellee,
                                    and

TIMKEN U.S. CORPORATION,

                                                            Defendant-Appellee,
                                    and

KOYO SEIKO CO., LTD., KOYO CORPORATION OF U.S.A.,
NACHI-FUJIKOSHI CORP., NACHI AMERICA, INC., and NACHI TECHNOLOGY, INC.,

                                                            Defendants.


        Robert A. Lipstein, Crowell & Moring LLP, of Washington, DC, argued for plaintiffs-appellants.  With him on the brief were Matthew P. Jaffe and Alexander H. Schaefer.

        Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee United States.  With her on the brief were Peter D. Keisler, Assistant Attorney General, and David M. Cohen, Director.  Of counsel on the brief were John D. McInerney, Chief Counsel; Berniece A. Browne, Senior Counsel; and Amanda L. Blaurock, Jennifer D. Jones, and Peter J. Kaldes, Attorneys, Office of Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC.

William A. Fennell, Stewart and Stewart, of Washington, DC, argued for defendant-appellee Timken U.S. Corporation.  With him on the brief were Terence P. Stewart, Geert M. De Prest, and Lane S. Hurewitz.

Appealed from:     United States Court of International Trade

Senior Judge Nicholas Tsoucalas

# United States Court of Appeals for the Federal Circuit

04-1223

NSK LTD. and NSK CORPORATION,

Plaintiffs-Appellants,

and

NTN CORPORATION, NTN BEARING CORPORATION OF AMERICA,
AMERICAN NTN BEARING MANUFACTURING CORPORATION,
NTN DRIVESHAFT, INC., and NTN-BOWER CORPORATION,

Plaintiffs,

v.

UNITED STATES,

Defendant-Appellee,

and

TIMKEN U.S. CORPORATION,

Defendant-Appellee,

and

KOYO SEIKO CO., LTD., KOYO CORPORATION OF U.S.A.,
NACHI-FUJIKOSHI CORP., NACHI AMERICA, INC., and NACHI TECHNOLOGY, INC.,

Defendants.

_____

DECIDED:  December 2, 2004
_____

Before RADER, LINN, and DYK, Circuit Judges.

LINN, Circuit Judge.

NSK Ltd. and NSK Corp. (collectively "NSK") appeal from the judgment of the Court of International Trade affirming the determinations of the Department of Commerce ("Commerce") holding that NSK's repacking expenses were correctly classified as a selling expense under 19 U.S.C. § 1677a(d)(1)(B) and refusing to grant NSK a partial level of trade adjustment for certain sales comparisons to normal value. NSK Ltd. v. United States, 217 F. Supp. 2d 1291, 1303-06 (Ct. Int'l Trade 2002). Because Commerce's classification of NSK's repacking expenses as selling expenses, and not movement expenses under 19 U.S.C. § 1677a(c)(2)(A), was arbitrary, we vacate and remand that determination. Because Commerce correctly refused to grant NSK a partial level of trade adjustment, we affirm that decision.

## I. BACKGROUND

This is an antidumping appeal, pertaining to antidumping duty orders on ball bearings and cylindrical roller bearings imported into the United States from May 1, 1996, through April 30, 1997. Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom, 63 Fed. Reg. 33,320 (Dep't Commerce June 18, 1998) (final admin. review) ("Final Results"). NSK Ltd. manufactured and sold the bearings in Japan during the review period; and NSK Corp., a related U.S. corporation, imported them into the United States.

NSK Corp. made deliveries to unaffiliated customers in the United States from various U.S. warehouses it owned and operated. NSK submitted to Commerce a list of

expenses incurred in bringing the bearings from Japan to its U.S. customers.  These expenses included costs for, inter alia, Japanese inland freight, Japanese warehousing, international freight, marine insurance, U.S. inland freight (from port to warehouse, and from warehouse to U.S. unaffiliated customers), U.S. customs duties, U.S. pre-sale warehousing, and U.S. repacking.  Commerce allowed deductions for all the expenses as movement expenses under 19 U.S.C. § 1677a(c)(2)(A), except U.S. repacking expenses, which it treated as direct selling expenses under 19 U.S.C. § 1677a(d)(1)(B). According to NSK, its repacking expenses were incurred when it unpacked merchandise in its warehouse from the international shipping packets into individual or small quantity boxes prior to shipment to unaffiliated U.S. customers.

NSK also submitted to Commerce data about its home market sales.  Commerce determined that there were two home market levels of trade:  original equipment manufacturers and aftermarket customers.  Commerce also found that constructed export price sales constituted a third, distinct level of trade.  NSK requested that Commerce calculate a level of trade adjustment measured by price differences between the level of trade found in the home market aftermarket and original equipment manufacturers' levels of trade.  Commerce rejected the request, and instead used a "constructed export price offset."

NSK appealed Commerce's classification of repacking expenses and its adjustment as to the level of trade.  The Court of International Trade affirmed both of Commerce's determinations, NSK, 217 F. Supp. 2d at 1303-06, and subsequently dismissed the case.

NSK appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## II. DISCUSSION

### A. Standard of Review

This court undertakes plenary review of a decision of the Court of International Trade affirming or reversing Commerce's final results of an administrative determination. NSK Ltd. v. United States, 115 F.3d 965, 972 (Fed. Cir. 1997). Our review of questions of statutory interpretation is de novo, except to the extent deference to an agency's construction of a statute it administers is required under the two-step analysis set forth in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). U.S. Steel Group v. United States, 225 F.3d 1284, 1286-87 (Fed. Cir. 2000). Where deference is due, "[t]he first question is whether Congress has directly spoken to the precise question at issue. If so, this court and the agency must give effect to the unambiguously expressed intent of Congress. If, however, Congress has not spoken directly on the issue, this court addresses the second question of whether the agency's interpretation is based on a permissible construction of the statute." Id. at 1287 (citations and internal quotation marks omitted).

### B. Repacking Expenses

Section 1677a(c)(2)(A) allows the constructed export price to be reduced by movement expenses. It provides that "[t]he price used to establish export price and constructed export price shall be . . . reduced by":

> the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of

shipment in the exporting country to the place of delivery in the United States . . . .

19 U.S.C. § 1677a(c)(2)(A) (2000).

A separate provision provides for different treatment of direct selling expenses, which are also used in calculating the constructed export price: "For purposes of this section, the price used to establish constructed export price shall also be reduced by . . . expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties . . . ." Id. § 1677a(d)(1)(B).

NSK submitted to Commerce a list of expenses, which included its U.S. repacking expenses.  Commerce reduced the U.S. price of the merchandise for all expenses that NSK listed except its repacking expenses.  Commerce denied NSK an allowance for the repacking expenses under § 1677a(c)(2)(A), instead treating NSK's repacking expenses as direct selling expenses under § 1677a(d)(1)(B).  Final Results, 63 Fed. Reg. at 33,339.  Commerce reasoned that:

> We do not view repacking expenses as movement expenses.  The repacking of subject merchandise in the United States bears no relationship to moving the merchandise from one point to another.  The fact that repacking is not necessary to move merchandise is borne out by the fact that the merchandise was moved from the exporting country to the United States prior to repacking.  Rather, we view repacking expenses as direct selling expenses respondents incur on behalf of certain sales which we deduct pursuant to section 772(d)(1)(B) of the statute [19 U.S.C. § 1677a(d)(1)(B)] . . . .

Id.

The Court of International Trade affirmed.  NSK, 217 F. Supp. 2d at 1305-06. The Court of International Trade reasoned that NSK's repacking expenses were properly classified as selling expenses because § 1677a(d)(1)(B) did not provide an exhaustive list and was not limited simply to credit expenses, guarantees, and

warranties.  Id. at 1305.  The Court of International Trade concluded that it was reasonable to classify the repacking expenses as selling expenses because the repacking was performed on individual products to facilitate their sale to unaffiliated U.S. customers.  Id.  Moreover, the Court of International Trade found that NSK's repacking expenses were not incidental to bringing the subject merchandise from the original place of shipment to the place of delivery in the United States, and that Commerce thus acted reasonably in refusing to classify the repacking expenses as movement expenses under § 1677a(c)(2)(A).  Id.

### 1.  The Parties' Arguments

NSK argues that Commerce erred in classifying its U.S. repacking expenses as selling expenses rather than movement expenses.  First, NSK points out that Commerce permitted the constructed export price to be reduced by several other types of similar expenses that it concluded were movement expenses under § 1677a(c)(2)(A).  These included:  Japanese inland freight (from plant to warehouse, and from warehouse to exit port), international freight, U.S. inland freight (from entry port to warehouse, and from warehouse to U.S. unaffiliated customers) ("U.S. shipping"), Japanese warehousing, marine insurance, U.S. brokerage, U.S. customs duties, and U.S. pre-sale warehousing.  NSK argues that if these categories of expenses were deemed movement expenses under § 1677a(c)(2)(A), then U.S. repacking expenses, which are indistinguishable from other pre-sale warehousing, handling, and insurance expenses, should also be categorized as movement expenses.

NSK next argues that Commerce's rationale for treating repacking expenses as transportation expenses cannot withstand scrutiny.  NSK contends that whether

repacking was required to bring merchandise from Japan to NSK's U.S. warehouse is irrelevant. NSK also argues that the repacking expenses were movement expenses because they were necessary to bring the merchandise to the place of delivery in the United States, e.g., each customer's place of business. NSK points out that repacking was necessary to make the requested quantities of bearings deliverable to U.S. customers. Finally, NSK argues that Commerce's contention that repacking was needed to sell the merchandise to an unaffiliated U.S. customer is inconsistent with its allowance of U.S. inland freight costs as movement expenses, which under Commerce's reasoning also would be "directly related" to specific sales.

Commerce responds that the Court of International Trade properly affirmed its decision that NSK's U.S. repacking expenses were selling expenses. Commerce relies on the following questionnaire response provided by NSK as evidence that its repacking expenses were selling expenses: "Merchandise normally is shipped from the U.S. warehouse in its original containers. In some instances, different pallets were used for shipment to U.S. customers and some repackaging may have occurred to accommodate smaller distributor orders." Joint Appx. at 205 (Response of NSK Ltd. and NSK Corp. to Section C of the Questionnaire at 32).

Commerce asserts that its rationale is correct that repacking bears no relationship to movement of the merchandise because the merchandise was moved from Japan to the United States prior to any repacking. Commerce further argues that repackaging expenses are distinct from warehousing expenses, because warehousing expenses are associated with storage before or during the movement process. Commerce finally argues that its statutory construction is correct because

§ 1677a(d)(1)(B) did not limit direct selling expenses to the enumerated credit expenses, guarantees, or warranties.

### 2. Analysis

Congress expected that Commerce "be able to speak with the force of law when it addresses ambiguity," United States v. Mead Corp., 533 U.S. 218, 229 (2001), in administering the antidumping statute. SKF USA, Inc. v. United States, 263 F.3d 1369, 1381 & n.14 (Fed. Cir. 2001). Therefore, we review Commerce's determination under Chevron. SKF, 263 F.3d at 1381 & n.14. The first question is "whether Congress has directly spoken to the precise question at issue." Chevron, 467 U.S. at 842. We conclude that as to NSK's repacking expenses Congress has not spoken, because both the movement and sale provisions of the statute may be reasonably interpreted to cover those costs.

Neither provision mentions repacking specifically. On the one hand, repacking could be a movement expense because it could arise "incident to bringing the subject merchandise from the original place of shipment . . . to the place of delivery in the United States." 19 U.S.C. § 1677a(c)(2)(A) (2000). Just as warehousing is considered a movement expense, repacking, especially to enable warehousing, could be deemed a movement expense. On the other hand, repacking could be a selling expense because it could be an "expense[] that result[s] from, and bear[s] a direct relationship to, the sale" to particular customers. Id. § 1677a(d)(1)(B). Having received an order, the importer could repack the merchandise to accommodate the customer. Because the movement and selling expense statutes do not unambiguously classify repacking expenses in one

category or the other, we must consider Commerce's interpretation under step two of Chevron.

"[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 843. We conclude that Commerce's determination that NSK's repacking expenses are properly classified as selling expenses under 19 U.S.C. § 1677a(d)(1)(B) is impermissible. Commerce's classification of repacking expenses as selling expenses is internally inconsistent with its classification of U.S. warehousing expenses and U.S. warehouse-to-customer-shipping expenses as movement expenses.

Commerce's first attempt to explain why repacking is not a movement expense is that "[t]he repacking of subject merchandise in the United States bears no relationship to moving the merchandise from one point to another." Final Results, 63 Fed. Reg. at 33,339. This point is unpersuasive because it is inconsistent with Commerce's treatment of warehousing. If the test is "bear[ing a] relationship to moving the merchandise," then U.S. warehousing (i.e., storing goods while awaiting sale to a customer) should not be a movement expense—goods do not move when they are stored.

Commerce next argues that NSK's successful movement of merchandise from Japan to the United States without repacking is evidence that "repacking is not necessary to move merchandise." Id. This rationale is unpersuasive because it too is inconsistent with Commerce's treatment of the U.S. warehousing expense. Under Commerce's rationale, U.S. warehousing also should be excluded from the scope of

04-1223                                    9

§ 1677a(c)(2)(A) movement expenses because the merchandise, in theory, could be moved from Japan to a U.S. customer without U.S. warehousing, simply by shipping the merchandise directly from Japan to the U.S. customer. However, Commerce considers U.S. warehousing to be a movement expense.

Finally, Commerce implies that even though the statute might allow it to classify repacking as a movement expense, because repacking occurs to enable a sale—whether to satisfy a customer's request for a different lot size or to accommodate shipping—it is a sales expense under § 1677a(d)(1)(B). See id. Once again, Commerce's rationale is internally inconsistent. Treating repacking as a sales expense is inconsistent with treating U.S. shipping as a movement expense. If enabling sales is the test, then U.S. shipping should be a sales expense. Like repacking that enables sales, U.S. shipping occurs after a customer places an order. Indeed, the cost of shipping the merchandise from the U.S. warehouse to the U.S. customer is incurred only because of and in furtherance of the sale. Commerce treats U.S. shipping as a movement expense, however, and fails to explain the inconsistency.

Expenses incurred for U.S. repacking, U.S. warehousing, and U.S. shipping (from the warehouse to particular customers) are analogous. To be consistent, it would appear that Commerce should classify them as the same type of expenses, whether that be as movement expenses or as sales expenses. If Commerce wants to treat these expenses inconsistently, then under Chevron we still must defer, but only if Commerce reasonably explains the inconsistency and does not act arbitrarily. See SKF, 263 F.3d at 1381-82 (vacating Commerce's decision to inconsistently define a term in two provisions of the antidumping statute because Commerce acted arbitrarily

by not providing a reasonable explanation for the inconsistency); Nat'l Org. of Veterans v. Sec'y of Veterans Affairs, 260 F.3d 1365, 1379 (Fed. Cir. 2001) (remanding a Department regulation to allow the agency to provide a reasonable explanation for its decision to interpret virtually identical statutory language inconsistently). Because Commerce did not sufficiently explain the aforementioned inconsistencies, its determination is arbitrary and impermissible. Commerce's classification of NSK's repacking expenses as selling expenses is vacated and remanded for reconsideration consistent with this opinion.

On remand, we caution Commerce to be mindful that repacking may have occurred for a number of different reasons. NSK indicated in its questionnaire response (the only evidence on which Commerce relied in making its decision) that NSK's practice is to bulk ship its merchandise from Japan to U.S. warehouses on pallets used for international shipping. NSK was required to unpack the merchandise from the international shipping pallets, and "in some instances," repack the merchandise into individual or small quantity boxes prior to shipment to U.S. customers. Joint Appx. at 205 (emphasis added). On this record, substantial evidence may not support a determination that NSK's repacking expenses were incurred as a direct result of or in furtherance of sales to particular customers. Indeed, NSK's counsel noted at oral argument that repacking is sometimes done for other reasons, e.g., to enable warehousing.

## C. Partial Level of Trade Adjustment

Commerce is directed by statute to base normal value upon home market sales at the same level of trade as the export price or the constructed export price. 19 U.S.C.

§ 1677b(a)(1)(B) (2000); see also Micron Tech., Inc. v. United States, 243 F.3d 1301, 1303-04 (Fed. Cir. 2001). The same level of trade means comparable marketing stages in the foreign market and in the U.S. market. Micron Tech., 243 F.3d at 1305. If Commerce cannot find sales in the foreign market at the same level of trade as in the U.S. market, then it will compare sales in the U.S. and foreign markets at different levels of trade. Id. When comparing sales at different levels of trade, Commerce may make a level of trade adjustment ("LOT adjustment") based on the price differences between the two levels of trade:

> The [normal value] shall also be increased or decreased to make due allowance for any difference (or lack thereof) between the export price or constructed export price . . . that is shown to be wholly or partly due to a difference in level of trade between the export price or constructed export price and normal value . . . .

19 U.S.C. § 1677b(a)(7)(A) (2000); see also Micron Tech., 243 F.3d at 1305.

In some instances Commerce will lack sufficient data regarding sales in the two markets to make a LOT adjustment. In those instances, the statutes provide for the application of a constructed export price offset ("CEP offset"), instead of a LOT adjustment. 19 U.S.C. § 1677b(a)(7)(B) (2000) ("When normal value is established at a level of trade which constitutes a more advanced stage of distribution than the level of trade of the constructed export price, but the data available do not provide an appropriate basis to determine under subparagraph (A)(ii) a level of trade adjustment, normal value shall be reduced by the amount of indirect selling expenses incurred in the country in which normal value is determined on sales of the foreign like product . . . ."); Micron Tech., 243 F.3d at 1305.

Commerce determined that there were two distinct levels of trade for NSK in the Japanese home market—aftermarket sales and original equipment manufacturer sales—and that these home market levels of trade were at a more advanced stage of distribution than the single constructed export price level of trade in the U.S. market. Final Results, 63 Fed. Reg. at 33,330. Commerce found that there was no record evidence to quantify the price difference between the two home market levels of trade and the single U.S. constructed export price level of trade. Id. Thus, Commerce made a CEP offset to the normal value for all of NSK's CEP transactions. Id. Contrary to NSK's arguments, Commerce concluded that it lacked "explicit authority to make a level-of-trade adjustment between two home-market levels of trade where neither level is equivalent to the level of the U.S. sale." Id. at 33,331.

On appeal, the Court of International Trade affirmed Commerce's use of a CEP offset. NSK, 217 F. Supp. 2d at 1304. The Court of International Trade interpreted 19 U.S.C. § 1677b(a)(7)(A) and concluded that a LOT adjustment was to be made to a price-based normal value only for a difference that is shown to be wholly or partly due to a difference in level of trade between the constructed export price or export price and the normal value. Id. at 1302. Under 19 U.S.C. § 1677b(a)(7)(B), a CEP offset was required when there was no sufficient data to determine a LOT adjustment under § 1677b(a)(7)(A). Id. at 1302-03. The Court of International Trade concluded that Commerce's practice at the time, as provided in 19 C.F.R. § 351.412(d) (1998), was to refuse to calculate a LOT adjustment in those cases where the home market data does not demonstrate that a constructed export price level of trade exists with respect to any transactions. Id. at 1303. The Court of International Trade concluded that Commerce's

conclusion that § 1677b(a)(7)(A) did not provide for a LOT adjustment, other than that based upon price differences in the home market between constructed export price and normal value market levels of trade, was reasonable.  Id.

### 1.  The Parties' Arguments

On appeal, NSK does not dispute the manner by which Commerce determined the levels of trade of its constructed export price or normal value transactions.  NSK objects to Commerce's decision not to calculate what it terms a "partial" LOT adjustment for constructed export price sales matched to aftermarket normal value sales, based on the price differences between original equipment manufacturer normal value sales and aftermarket normal value sales.  NSK relies on language in 19 U.S.C. § 1677b(a)(7)(A) that normal value must be adjusted to reflect any difference "that is shown to be wholly or partly due to a difference in level of trade between the export price or constructed export price and normal value."  (emphasis added).  NSK argues that because the language requires a LOT adjustment if it "partly" adjusts for differences in the levels of trade, a "partial" LOT adjustment is mandated in this case.

Commerce responds that it properly rejected NSK's proffered "partial" LOT adjustment.  Commerce argues that it correctly interpreted 19 U.S.C. § 1677b(a)(7) and properly concluded that it lacked statutory authority to make a LOT adjustment using two home market levels of trade where neither level is equivalent to the CEP level of trade.

2. Analysis

We agree that Commerce correctly interpreted 19 U.S.C. § 1677b(a)(7) and properly denied NSK's request for a "partial" LOT adjustment. NSK's statutory interpretation is predicated on the presence of the word "partly" in § 1677b(a)(7)(A). Section 1677b(a)(7)(A) provides:

(A) Level of trade

The price described in paragraph (1)(B) shall also be increased or decreased to make due allowance for any difference (or lack thereof) between the export price or constructed export price and the price described in paragraph (1)(B) (other than a difference for which allowance is otherwise made under this section) that is shown to be wholly or <u>partly</u> due to a difference in level of trade between the export price or constructed export price and normal value, if the difference in level of trade—

(i) involves the performance of different selling activities; and

(ii) is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade in the country in which normal value is determined.

In a case described in the preceding sentence, the amount of the adjustment shall be based on the price differences between the two levels of trade in the country in which normal value is determined.

19 U.S.C. § 1677b(a)(7)(A) (2000) (emphasis added). The word "partly" indicates that a LOT adjustment should be made even when pricing differences between home market levels of trade are only partly attributable to the difference in the level of trade. The partial adjustment must still be between normal value at one level of trade and normal value at the same level of trade as the U.S. sale. Thus, the use of the term "partly" does not mandate a partial LOT adjustment when there are no comparable levels of trade in the home and U.S. markets, and Commerce determines there was insufficient data to make a LOT adjustment. In those instances, 19 U.S.C. § 1677b(a)(7)(B)

mandates the use of an alternate adjustment, known as a "CEP offset":

> (B) Constructed export price offset
>
> <u>When normal value is established at a level of trade which constitutes a more advanced stage of distribution than the level of trade of the constructed export price, but the data available do not provide an appropriate basis to determine</u> under subparagraph (A)(ii) <u>a level of trade adjustment</u>, normal value shall be reduced by the amount of indirect selling expenses incurred in the country in which normal value <u>is determined</u> on sales of the foreign like product but not more than the amount of such expenses for which a deduction is made under section 1766a(d)(1)(D) of this title.

19 U.S.C. § 1677b(a)(7)(B) (2000) (emphases added).  This court noted in <u>Micron Technologies</u>:

> In some instances, the level of trade in the home market will constitute a more advanced stage of distribution than the level of trade in the United States, yet Commerce will lack sufficient data regarding the sales in the two markets to make a level of trade adjustment, that is, it will be unable to determine how much to reduce the foreign sale price to arrive at a price comparable to the U.S. price.  In those cases, the statute provides for the award of a 'constructed export price offset' [("CEP offset")].

243 F.3d at 1305.  A CEP offset is designed to cover situations such as these for which the normal value is at a more advanced stage than the constructed export price level of trade, and for which Commerce determines there is insufficient data to make a LOT adjustment.  <u>See</u> 19 U.S.C. § 1677b(a)(7)(B) (2000); <u>see also</u> <u>Koyo Seiko Co. v. United States</u>, 8 F. Supp. 2d 862, 866 (Ct. Int'l Trade 1998) ("Commerce's interpretation . . . is reasonable, in light of the existence of the CEP offset to cover situations such as those at issue.").  Thus, we conclude that Commerce did not err in applying a CEP offset and denying NSK's request for a "partial" LOT adjustment.

## III. CONCLUSION

Because Commerce's classification of NSK's repacking expenses as a selling expense was arbitrary, we vacate that determination and remand for further proceedings. Because Commerce correctly refused to grant NSK a partial level of trade adjustment, we affirm that portion of its decision.

<u>AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED</u>

## IV. COSTS

No costs.