REYNA, Circuit Judge,
dissenting-in-part.
I join part II of the majority’s opinion finding that PPC has standing to seek a general exclusion order with respect to the '539 patent. I respectfully dissent from the remainder of the majority opinion because I believe that additional fact-finding is needed to determine whether PPC’s research and development expenditures were a substantial investment in exploitation, and because the Commission erred in its interpretation and application of § 337(a)(3)(C) resulting in its wholesale rejection of litigation expenses — except in very limited circumstances — for the purpose of meeting the “domestic industry” requirement in § 337 cases.
I. Background
John Mezzalingua Associates, Inc., d/b/a PPC, Inc. (“PPC”) is a domestic producer of coaxial cable connectors used in the telecommunications, satellite, and cable television industries. PPC is headquartered in East Syracuse, New York, where a substantial portion of its employees are located, and where a substantial portion of its research, development, and commercial production take place. Innovations within its field have enabled PPC to obtain a portfolio of utility and design patents in the United States.
PPC is a successful business that has grown and expanded in recent years, but its business has been negatively impacted by significant competition from imports of “a flood of copy-cat products” by manufacturers in China and Taiwan. A20142-43, A20354-55, A20379-80. For a variety of reasons, the copy-cat imports are sold at prices that severely undercut PPC’s pricing.
Noah Montena joined PPC’s Syracuse facility in 1997 as a product engineer and worked to develop a new product for PPC called the “EX” connector. PPC invested a considerable sum of money in research and development that resulted in the EX connector product. Mr. Montena’s work on the EX connector also resulted in both a utility invention and an ornamental design, each of which were separately patented as U.S. Patent No. 6,558,194 (“the '194 patent” or “the utility patent”) and U.S. Patent No. D440,539 (“the '539 patent” or “the design patent”), with Mr. Montena as the sole named inventor on each patent. The patented ornamental design was for a coaxial cable connector having the following appearance:
*1332 [[Image here]]
The record shows that PPC’s attempts to license patents in its portfolio were “generally ignored” and “weren’t taken seriously.” A02146-99, A30043. PPC’s Vice President testified that “[t]here was a general feeling in the connector industry that there was a tremendous reluctance to take any licenses.” A30043. There was even more skepticism of design patents, which were previously “nonexistent in the connector industry,” especially those that had never been tested in court. A30021, A00326.
On May 5, 2001, PPC sued its competitor Arris International, Inc. in the Middle District of Florida, alleging that Arris’ “Digicon” connector infringed the '539 patent. The parties engaged in settlement discussions during the pendency of the Florida action, but no settlement was reached. PPC ultimately obtained a jury verdict that the '539 patent was valid and infringed by Arris, and was awarded damages and an injunction. That judgment was appealed by Arris and affirmed by this court. John Mezzalingua Associates, Inc. v. Antee Corp., 81 Fed.Appx. 309 (Fed.Cir. 2003). Arris next sought to circumvent the injunction by adding labels to its Digicon connectors to conceal the infringing design, and PPC filed a contempt motion, which was denied. On December 21, 2001, PPC also sued Arris’ distributor, International Communications Manufacturing Corporation (“ICM”) and its owner Randall Holiday in the District of Colorado for infringement of the '539 patent by its “F-Conn” connectors supplied by Arris. Considerable sums were spent by PPC in legal fees and costs pursuing the Florida and Colorado infringement actions.
On July 1, 2003, less than two months after PPC’s '194 utility patent issued, PPC sued Arris in the Western District of Wisconsin for infringement of the '194 patent by its Digicon connectors. In December of 2003, PPC received a jury verdict that Arris’ Digicon connectors infringed the '194 patent, and that the infringement was willful. Within a week of the jury verdict, negotiations began to settle the outstanding lawsuits. Those negotiations resulted in a settlement agreement and separate license agreement which encompassed the '539 patent, and under which Arris, ICM, and Holliday agreed to pay money to PPC.
PPC next filed a complaint with the International Trade Commission (“ITC”) under 19 U.S.C. § 337(a)(3)(C) to prevent the importation of connectors that were alleged to infringe the '539 patent, the '194 patent, and other patents owned by PPC.[1] The ITC issued its Notice of Investigation on May 30, 2008. 73 Fed.Reg. 31145. Because PPC requested a general exclusion *1333 order with respect to the '589 patent, PPC was required to make out a prima facie case of such entitlement, which included establishing that a domestic industry existed under Section 387. After a seven-day evidentiary hearing, the Administrative Law Judge (“ALJ”) initially determined that the '539 patent was valid and infringed by four Chinese Respondent companies that failed to participate in the investigation,[2] and that a Section 337 violation had occurred. Certain Coaxial Cable Connectors and Components Thereof and Products Containing Same, No. 337-TA-650, at 115-117, 2009 WL 3694421 (Int’l Trade Comm’n October 13, 2009) (“Initial Determination ”).
The ALJ also found that PPC satisfied the domestic industry requirement based on: (1) PPC’s considerable litigation expenses incurred in asserting the '539 patent against Arris in the Florida action; (2) the substantial sum of money received from Arris under the ultimate settlement and license agreement with PPC, a portion of which was attributable to the '539 patent; (3) PPC’s considerable research and development costs that resulted the EX connector product, whereby “at least some portion of Mr. Noah Montena’s salary, plus his time, effort and use of PPC’s equipment and facilities, is attributable to his development of the design that became the '539 patent.” Id. at 112-13.
After finding that a limited exclusion order would likely be circumvented, the ALJ recommended the issuance of a general exclusion order. Id. at 143. The record shows that this recommendation was based largely on the business practices utilized by the Chinese Respondents, such as having overlapping locations, personnel, and operations. The ALJ explained that “in China, the licensing system makes it very common and inexpensive for individuals or families to operate Chinese companies under a number of different names.” Id. at 122. The ALJ observed that lack of clarity as to the precise relationship among the four Respondents having demonstrated commonalities was indicative of the.ease with which Chinese entities could establish new companies and continue to import infringing compression connectors if barred only by a limited exclusion order. Id. at 142-43. A PPC corporate representative testified that if PPC were able to identify and assert its patent rights against one such Chinese importer, it would be easy for that company to circumvent patent enforcement efforts: “In many cases, they would just pick up the operation and move, change the name of the company, take out a new business license, and be manufacturing within a relatively short period” of about two weeks. Id. at 123. PPC’s counsel characterized this predicament as follows:
These [Respondents] are defaulters that we engaged in the ITC ... companies that didn’t even appear, and the district courts are not too helpful for such infringers. They won’t show up. They won’t obey injunctions. They will appear in a different guise with a different name, with a knockoff product.
Oral Arg. at 13:28-14:27.
Upon review of the ALJ’s initial determination the ITC reversed, finding that *1334 the simultaneous investment in engineering, research, and development of PPC’s EX connector was not attributable to the design of the connector, but rather was directed to the underlying functionality. Certain Coaxial Cable Connectors and Components Thereof and Products Containing Same, No. 337-TA-650, at 52-53 (Int’l Trade Comm’n March 31, 2010) (“Without a showing to the contrary, we find that Mr. Montena’s salary, time, effort, and use of PPC’s equipment and facilities are more likely attributable to his development of the structural and functional design of the connector ... than to his development of the ornamental design.”) (“Comm’n Op.”). Regarding litigation and licensing activities in general, the ITC determined that
We conclude that patent infringement litigation activities alone, i.e., patent infringement litigation activities that are not related to engineering, research and development, or licensing, do not satisfy the requirements of section 337(a)(3)(C). However, litigation activities (including patent infringement lawsuits) may satisfy these requirements if a complainant can prove that these activities are related to licensing and pertain to the patent at issue, and can document the associated costs.
Id. at 43-44. As to PPC’s asserted litigation expenses and licensing activities in particular, the Commission found that the record was insufficient to determine whether the required nexus had been shown and what the associated litigation costs were, and remanded to the ALJ for additional fact finding. Id. at 54.
On remand the ALJ concluded that PPC’s settlement and license agreement had a sufficient nexus with the litigation, but that only the attorney time billed specifically for settlement negotiations and license agreement preparation could constitute “investments” in licensing under Section 337(a)(3)(C). Certain Coaxial Cable Connectors and Components Thereof and Products Containing Same, No. 337-TA-650, at 8-13, 19, 24, 2010 WL 2451681 (Int’l Trade Comm’n May 27, 2010) (“Remand Determination”). The sum of those particular legal expenditures was considerably smaller than the total litigation expenses, and would need to be further discounted to reflect the portion of the billable time that was spent on the '539 patent as opposed to other patents or other matters. Id. at 19-25. The ALJ found this lesser amount to be an insufficient investment in patent licensing activities to show the existence of a domestic industry, and therefore no § 337(a)(3)(C) violation was found. Id. at 25. The ITC declined to review the ALJ’s determinations on remand, and this appeal followed. Certain Coaxial Cable Connectors and Components Thereof and Products Containing Same, No. 337-TA-650, at 1-2 (Int’l Trade Comm’n July 12, 2010).
II. Discussion
The ITC’s Final Determination is reviewed in accordance with the Administrative Procedure Act. See Honeywell Int’l, Inc. v. ITC, 341 F.3d 1332, 1338 (Fed.Cir.2003). This court must set aside any findings or conclusions of the ITC that are “arbitrary, capricious, or otherwise not in accordance with law.” 5 U.S.C. § 706(2)(A). The ITC’s legal conclusions are reviewed de novo. Honeywell, 341 F.3d at 1338.
Statutory interpretation by the ITC is a legal issue reviewed de novo, except to the extent deference to the ITC’s construction of a statute it administers is required under the two-step analysis set forth in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. *1335 2778, 81 L.Ed.2d 694 (1984). NSK Ltd. v. United States, 390 F.3d 1352, 1354 (Fed.Cir.2004). The ITC’s interpretation must be set aside if is it is “arbitrary, capricious, or manifestly contrary to the statute.” Chevron, 467 U.S. at 844, 104 S.Ct. 2778.
A. PPC’s Investment in Engineering, Research, and Development
The ITC determined that although PPC had made considerable investments in the engineering, research, and development of its EX connector, the investment was directed solely to the underlying functionality of the connector, and therefore could not support a finding of domestic industry with respect to a patented design that arose out of the very same effort. No apportionment or weight was given to PPC’s research and development regarding the design. See Comm’n Op. at 52-53.
The ITC emphasized the following findings: the '539 design patent and the '194 utility patent include the same drawing figures; both patents were filed as continuations of a single prior application; and PPC has not made any product covered by its '539 patent. Id. Based on these findings, the ITC concluded that “Mr. Montena’s salary, time, effort, and use of PPC’s equipment and facilities are more likely attributable to his development of the structural and functional design of the connector ... than to his development of the ornamental design.” Id. This conclusion was arbitrary and capricious.
First, the ITC’s analysis regarding PPC’s research and development expenditures was cursory and arbitrary. The ITC suggests that “without a showing to the contrary,” a design patent that was based on an underlying utility application having the same drawing figures renders the design a mere incidental afterthought to which no amount of investment or effort can be attributed. Id. Since the ITC does not base its reasoning on any evidence or testimony as to the work done by the inventor of the connector and creator of the design, its determination that such a patent application filing strategy must reveal that the design was essentially valueless was speculative. This decision arbitrarily diminishes the availability of section 337 relief with respect to design patents and undermines the value of design patents generally. Design patents possess unique and valuable properties long ago recognized by the Supreme Court. See Gorham Co. v. White, 81 U.S. 511, 524-25, 14 Wall. 511, 20 L.Ed. 731 (1871) (“The law manifestly contemplates that giving certain new and original appearances to a manufactured article may enhance its salable value, may enlarge the demand for it, and may be a meritorious service to the public.”). Design patents protect fundamentally different subject matter than that which is encompassed by a utility patent, and can be used to effectively and efficiently combat knock-off products that can be easily identified by visual inspection alone.
Second, that PPC has not made and sold products covered by the '539 patent is not a reasonable basis to entirely discount PPC’s research and development of the design. It is clear that Mr. Montena’s work yielded a functional connector invention and an ornamental design for it. Some non-zero portion of Mr. Montena’s time and effort was necessarily devoted to the ornamental aspects of the connector. It was arbitrary for the ITC to assume that this portion was de minimis and insubstantial because PPC did not ultimately put the design into one of its commercial products. PPC may have had good business reasons for not including the patented design in its products. The mere non-use of the design cannot justify a total disre *1336 gard of the related underlying investment in research and development of it.
Third, the ITC should be wary of diminishing the contribution of an ornamental design particularly where, as here, the inventor/designer’s effort yields both functional and ornamental features applicable to the same underlying article. The result may be greater than the sum of its parts, and the parts may not be easily separable. See Perry J. Saidman & Theresa Esquerra, A Manifesto on Industrial Design Protection: Resurrecting the Design Registration League, 55 J. Copyright Soc’y USA 423, 425 (2008) (“Since a good industrial design ideally inseparably blends form and function, the designer is penalized [by the functionality doctrine] because her design embodies functional qualities.”). Patentable designs are by definition embodied in underlying utilitarian articles. See 35 U.S.C. § 171 (“Whoever invents any new, original, and ornamental design for an article of manufacture may obtain a patent therefore....”) (emphasis added). Whether or not that underlying article embodies a separately patentable utility invention, the utility of the article itself cannot be presumed to completely overshadow the investment in research and development of the article’s design.
The majority argues that no remand is necessary because the ITC found PPC failed to meet its burden of proof on the issue of investment in research and development of the patented design. See Comm’n Op. at 52 (“PPC presented no evidence of any investment in research and development related to the '539 patent.”). While PPC did not affirmatively apportion out its investment as it pertained to the '539 design patent only, PPC introduced substantial evidence showing its considerable investment in the EX connector research project as a whole, which necessarily included the work that yielded the patented design. The ALJ considered all the evidence and found it sufficient to show that “at least some portion of Mr. Montena’s salary, plus his time, effort, and use of PPC’s equipment and facilities, is attributable to his development of the design that became the '539 patent.” Initial Determination at 113. The ITC rejected “[t]his inference,” and instead would have required some better or more precise allocation of investment costs to show direct attribution to the design. Comm’n Op. at 52-53. Without first verifying the possibility and extent to which such an allocation can be made, there are no facts in the record before us sufficient to support the ITC’s conclusion that time and resources spent by PPC in researching or developing the ornamental design of the '539 patent are “minimal” and could not constitute a substantial investment. Comm’n Op. at 52-53. This conclusion is not a cost allocation but mere conjecture. The ITC’s determination that PPC’s research and development with respect to the design patent failed to meet a substantial investment threshold was therefore arbitrary and capricious. Remand is necessary to conduct further fact finding as to the extent to which PPC’s research and development efforts may be allocated between the functional and ornamental features created by Mr. Montena.
B. PPC’s Investment in Exploitation
Section 337(a)(3)(C)’s applicability to litigation expenses is an issue of first impression before the ITC and before this court. The ITC correctly characterized PPC’s asserted litigation expenses as “raising] an important issue of statutory interpretation,” namely, “whether litigation activities can constitute ‘exploitation’ under section 337(a)(3)(C)” so as to support a finding of a domestic industry. Comm’n Op. at 41, 43. As noted above, the ITC answered that question as follows:
*1337 We conclude that patent infringement litigation activities alone, i.e., patent infringement litigation activities that are not related to engineering, research and development, or licensing, do not satisfy the requirements of section 337(a)(3)(C). However, litigation activities (including patent infringement lawsuits) may satisfy these requirements if a complainant can prove that these activities are related to licensing and pertain to the patent at issue, and can document the associated costs.
Id. at 44. This interpretation of § 337(a)(3)(C) is to be reviewed de novo, since no deference is owed to the ITC under Chevron in this instance.[3]
The original Tariff Act of 1930 required a showing of domestic industry, as well as an independent showing of injury to that domestic industry, to bring a successful claim under section 337. See, e.g., Akzo N.V. v. ITC, 808 F.2d 1471, 1486-87 (Fed. Cir.1986) (“[T]o prove a violation of § 337, the complainant must show both an unfair act and a resulting detrimental effect or tendency.”). In 1988 Congress eliminated the injury requirement and added what is now section 337(a)(3) to specify how a domestic industry may be established. At that time the ITC was already finding a domestic industry to be shown via manufacturing activity such as investment in manufacturing infrastructure or employment of labor or capital. S.Rep. No. 100-71, at 129 (1987); H.R.Rep. No. 100-40, at 157 (1987). Believing that the ITC was too rigidly requiring such manufacturing activity, Congress considerably lowered the domestic industry requirement threshold by permitting non-manufacturing activity such as licensing and research to show the existence of a domestic industry. H.R. Rep. NO. 100-40, at 157. Thus, the following text of section 337(a)(3) was enacted:
an industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent, copyright, trademark, mask work, or design concerned—
(A) significant investment in plant and equipment;
(B) significant investment in labor or capital; or
(C) substantial investment in its exploitation, including engineering, research and development, or licensing.
19 U.S.C. § 1337(a)(3).
Under Chevron we must first look to whether Congress has directly spoken to the issue of whether litigation activities can alone support a finding of a substantial investment in exploitation under *1338 § 387(a)(8)(C). 467 U.S. at 842-43, 104 S.Ct. 2778. Neither party contends that Congress has directly addressed this precise issue. Indeed, the plain language of § 337 is silent as to how litigation or patent enforcement expenses should be treated.
In the legislative history of the 1988 amendment to section 337, Congress was clear that “[t]he mere ownership of a patent ... would not be sufficient to satisfy [the domestic industry requirement]. The owner of the property right must be actively engaged in steps leading to the exploitation of the intellectual property, including application engineering, design work, or other such activities.” S. Rep. NO. 100-71, at 130. Congress gave examples of universities or small startup companies “licensing their rights to manufacturers” as acceptable kinds of domestic industries. Id. at 129; Comm’n Op. at 47-48. Although Congress clearly intended to require something more than mere ownership of a patent, it did not exclude litigation activities as indicia of being actively engaged in the exploitation of the patent. The question then becomes whether the ITC’s interpretation to exclude litigation expenses not tied to licensing was a permissible construction, i.e., one which is not “arbitrary, capricious, or manifestly contrary to the statute.” Chevron, 467 U.S. at 842-44, 104 S.Ct. 2778.
The ITC conceded that the plain language of section 337(a)(3)(C) does not limit the kinds of activities that can be considered exploitation, but rather provides an exemplary listing of activities that can constitute exploitation. Comm’n Op. at 45; 19 U.S.C. § 1337(a)(3)(C). Nevertheless, the ITC “decline[d] ... to venture beyond these three examples because we are not convinced that patent infringement litigation activities unrelated to engineering, research and development, or licensing constitute ‘exploitation’ for purposes of the statute.” Comm’n Op. at 45. It emphasized that “Congress could have easily included patent infringement litigation [in the list], but did not.” Id. at 45. Furthermore, the ITC believed that “[allowing patent infringement litigation activities alone to constitute a domestic industry would place the bar so low as to effectively render it meaningless,” and Congress plainly intended for more than mere ownership of patent right to suffice. Id. at 46. Hence, the ITC announced a litigation-licensing nexus rule. Id. at 50.
The ITC’s interpretation of section 337(a)(3)(C) is unduly narrow, and is “manifestly contrary to the statute.” Chevron, 467 U.S. at 842-44, 104 S.Ct. 2778. Congress did not enact language that limited the term “exploitation” to activity only related to one of the named examples listed in the statute. Congress left the list open-ended to provide flexibility for what may be deemed to constitute exploitation, expressing that criteria other than the examples would appropriately qualify for consideration. See § 337(a)(3)(C) (“exploitation, including engineering, research and development, or licensing”) (emphasis added); see also S. REP. NO. 100-71, at 130 (1987) (discussing the consideration of “engineering, design work, or other such activities ”) (emphasis added). The ITC failed to articulate any reasonable basis in the legislative history — let alone an “extraordinary showing of contrary intentions” — to justify such a departure from the plain meaning of the statutory language. See Garcia v. United States, 469 U.S. 70, 75, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984). The legislative history compels that “exploitation” be read broadly in accordance with the statutory text. See S. Rep. NO. 100-71, at 130. The ITC’s construction artifi *1339 dally and arbitrarily narrowed the domestic industry requirement.
The majority misapprehends the threshold domestic industry requirement through its perception that the ITC is “fundamentally a trade forum, not an intellectual property forum.” This view ignores the statutory role of the ITC and the legislative purpose of section 337, and tends to place an undue expectation of trade-related or production-related activity when analyzing the domestic industry requirement. The ITC took a similar view of itself and of section 337, suggesting that “exploitation” is shown only by “taking steps to foster propagation or use of the underlying intellectual property” or by engaging in “activities that serve to encourage practical applications of the invention or bring the patented technology to market.” Comm’n Op. at 49. As this court has observed, however, “[w]hen Congress amended section 337 of the Tariff Act of 1930 in 1988 to provide the definition of domestic industry now found in subsection (a)(3), it stated that its purpose was ‘to make [section 337] a more effective remedy for the protection of United States intellectual property rights.’ ” Texas Instruments Inc. v. ITC, 988 F.2d 1165, 1181 (Fed.Cir.1993) (quoting Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100-418, § 1341(b), reprinted in 1988 U.S.C.C.A.N. (102 Stat.) 1107, 1212 (codified at 19 U.S.C. § 1337)) (emphasis added). Thus when Congress amended § 337 it revised the standing requirement to eliminate the need to show material injury, a factor that is plainly trade-related, and thereby charged the ITC with administering a statute having a primary purpose of enforcing valid intellectual property rights. See Thomas A. Broughan, III, Modernizing § 337’s Domestic Industry Requirement for the Global Economy, 19 Fed. Cir. B.J. 41, 79 (2009) (“The statute requires the ITC to consider the health and public welfare and competitive conditions in balancing the interests of U.S. consumers against those of owners of intellectual property... .”). Subsequent to the 1988 amendment, the number of actions for enforcement of intellectual property rights against infringing imports have increased and become the most prominent of complaints brought before the ITC. See William P. Atkins & Justin A. Pan, An Updated Primer on Procedures and Rules in 337 Investigations at the U.S. International Trade Commission, 18 U. Balt. Intell. Prop. L.J. 105, 107 (2010) (“Section 337 has evolved almost exclusively into an intellectual property enforcement statute.”); Joel W. Rogers & Joseph P. Whitlock, Is Section 337 Consistent with the GATT and TRIPS Agreement?, 17 Am. U. Int’l L.Rev. 459, 470-471 (2002) (“Section 337 is a powerful border enforcement mechanism to be used against imports that infringe a U.S. patent.... Section 337 is often used for intellectual property claims instead of other ‘unfair methods of competition’ claims.”). I disagree with both the ITC and the majority in that with regard to section 337 investigations, I view the ITC as an intellectual property enforcement forum.
In its capacity as an administrator of an important intellectual property enforcement statute, it is error for the ITC to limit the scope of its section 337 investigations to those where the complainant is involved in traditional trade-based or goods-based activities. The ITC must understand that patentees have no affirmative right to practice their inventions, but only the right to exclude others from doing so. TransCore, LP v. Elec. Transaction Consultants Carp., 563 F.3d 1271, 1275 (Fed.Cir.2009). A patent right is therefore empty without the ability to meaningfully enforce it against infringers. Congress recognized this fact when it added *1340 section 337(a)(3)(C) to give patentees “more effective” means to enforce their rights. Tex. Instruments, 988 F.2d at 1181. By permitting patent rights to be more effectively enforced at the border, Congress again advanced the axiom that enforceable patent rights are good for innovation and for the economy. See Hilton Davis Chem. Co. v. Warner-Jenkinson Co., Inc., 62 F.3d 1512, 1529 n. 1 (Fed.Cir.1995) (Newman, J., dissenting) (“Techno-logic innovation has driven the American economy, over the past century, to the exclusion of virtually all other growth factors .... [P]atent-based innovation has a positive impact on the economic system as new industries and new goods displace the old.”); Andrew Beckerman-Rodau, Patents are Property: A Fundamental But Important Concept, 4 J. Bus. & Tech. L. 87, 93 (2009) (“Absent the ability to assert patent property rights, fewer inventions will be patented and the public storehouse of knowledge will decrease without the public disclosure from those patents.”); see also 35 U.S.C. § 271(a) (deeming importation of a patented article to constitute infringement). Conversely, the incentive for domestic producers to innovate is all but destroyed if their patents are being infringed by foreign companies that vanish at the first sign of legal opposition to their importation or domestic sales, only to later resurface under a new name with more infringing products. For such situations, Congress made meaningful relief available to patentees by enabling the ITC to issue exclusion orders to stop infringement at the border. As shown in PPC’s case, there exists strong motivation for infringers to circumvent U.S. patent enforcement efforts, a circumstance that can only be effectively addressed through the issuance of a general exclusion order. Initial Determination at 143.
Although standing for such exclusionary relief requires activity beyond “mere ownership” of a patent, S. REP. NO. 100-71, at 130, Congress deemed that standing could exist via any “exploitation” of the patent — i.e., any activity that puts the patent to a productive use or otherwise takes advantage of it. See Williams v. Taylor, 529 U.S. 420, 431, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) (explaining that Congress is presumed to have intended each word in a statute would be given its “ordinary, contemporary, common meaning”); Comm’n Op. at 49 (finding that when Congress amended section 337 in 1988, to “exploit” meant “to put to a productive use” or “to take advantage of’). This threshold is intentionally very low, in keeping with Congress’ goal to make section 337 a more effective patent enforcement statute. Indeed, a patentee need not even be engaged in the exploitative activity per se as long as its activity is an “investment in [the patent’s] exploitation.” § 337(a)(3)(C) (emphasis added). A domestic industry can be shown to exist by those “actively engaged in steps leading to the exploitation of the intellectual property.” S. Rep. No. 100-71, at 130 (emphasis added). Under the broad language of section 337(a)(3)(C), patent infringement litigation is an investment in the exploitation of a patent.
Securing a judgment of validity and infringement substantially strengthens and increases the value of the patent. See John R. Allison et al., Valuable Patents, 92 Geo. L.J. 435, 439-440 (2004) (“[L]itigated patents tend to be much more valuable than others on average....”). Stronger patent rights are also better able to attract investment to support an industry and provide higher returns on those investments. See Mark A. Lemley, The Economics of Improvement in Intellectual Property Law, 75 Tex. L.Rev. 989, 994 (1997) (“[I]ndividuals will not invest in invention or creation unless the expected return from doing so exceeds the cost of doing so — that *1341 is, unless they can reasonably expect to make a profit from the endeavor.”). In these ways, infringement litigation can be a productive and advantageous use of patent rights which better fortify the patentee’s position in the marketplace. Indeed, it appears that absent PPC’s infringement actions the '539 patent would never have become sufficiently valuable or marketable for PPC to have obtained the license agreement that it did. The infringing competitors only stopped infringing and licensed PPC’s patents at the point of a sword forged and tempered in the district courts.
When faced with a flood of infringing “copy-cat” imports able to undercut their prices, it is unreasonable that entities like PPC be discouraged from first enforcing a patent in litigation in lieu of producing the patented article to compete in the marketplace while at a clear economic disadvantage. Likewise, when an industry is highly reluctant to license patents in the relevant technological field, a patentee should be able to pursue litigation as an alternative or precursor to licensing negotiations without diluting its patent rights. Litigation in these contexts constitutes an investment in exploitation. Entities that are or can become market participants in the field of the patented technology should not be deemed to lack standing for a section 337 action if those entities have substantially staked out their claim to the technology via infringement litigation.
Litigation undertaken to enforce patent rights and enhance the value of a patent or pave the way for a stronger competitive advantage constitutes an investment in exploitation under section 337(a)(3)(C), regardless of that activity’s relationship to licensing, engineering, research, or production. Here, the ITC’s determination to exclude litigation costs untethered to licensing from consideration has impermissibly and arbitrarily limited the reach of section 337 for patent owners.
III. Conclusion
For the foregoing reasons, I would reverse the ITC determination and remand for additional fact finding as to how much investment PPC made into the research and development of the design, and to determine whether PPC’s infringement litigation costs, alone or in combination with its research and development costs, are substantial enough to give rise to the existence of a domestic industry.

. The eight named Respondents were Aska Communication Corp., Edali Industrial Corp., Fu Ching Technical Industrial Co., Ltd., Gem Electronics, Hanjiang Fei Yu Electronics Equipment Factory, Zhongguang Electronics, Yangzhou Zhongguang Electronics Co., Ltd., and Yangzhou Zhongguang Foreign Trade Co., Ltd.

. The four Respondents located in China, Hanjiang Fei Yu Electronics Equipment Factory, Zhongguang Electronics, Yangzhou Zhongguang Electronics Co., Ltd., and Yangzhou Zhongguang Foreign Trade Co., Ltd., were all held in default for failing to answer the Complaint, and their products formed the basis for the ALJ’s determinations of infringement of the '539 patent. Only Fu Ching Technical Industrial Co., Ltd. and Gem Electronics participated throughout the investigation, but the '539 patent was not asserted against them. Aska Communication Corp. and Edali Industrial Corp. were terminated from the investigation pursuant to a consent order.

. Statutory construction was well briefed at ITC, and was a critical and dispositive element of the ITC's decision. Comm'n Op. at 41-51. PPC’s declining to affirmatively raise this issue again on appeal therefore does not foreclose this court from addressing this "pure question of law that cries out for resolution.” See Rybarczyk v. TRW, Inc., 235 F.3d 975, 984 (6th Cir.2000) ("Failure to raise an issue on appeal would normally constitute a waiver of that issue. Here, however, we have a pure question of law that cries out for resolution — and in such a situation we are not foreclosed from considering the issue.”) (citation omitted); see also United States v. Carlson, 900 F.2d 1346, 1349 (9th Cir.1990) (explaining that a court may reach questions otherwise not properly before it where "the issue presented is purely one of law and the opposing party will suffer no prejudice as a result of the failure to raise the issue”). While the majority frames the issue before this court as "relating] to the sufficiency of its evidence linking various litigation expenditures to licensing,” that view assumes that the ITC correctly interpreted section 337(a)(3)(C) to require such a nexus between litigation and licensing. It is therefore necessary to address the ITC’s interpretation of section 337(a)(3)(C), as the statutory construction question forms the true basis of the dispute before this court.