# United States Court of Appeals for the Federal Circuit

---

**JOHN MEZZALINGUA ASSOCIATES, INC. (DOING BUSINESS AS PPC, INC.),**
*Appellant,*

v.

**INTERNATIONAL TRADE COMMISSION,**
*Appellee.*

---

2010-1536

---

On appeal from the United States International Trade Commission in Investigation No. 337-TA-650.

---

Decided: October 4, 2011

---

JOHN F. SWEENEY, Locke Lord Bissell & Liddell, LLP, of New York, New York, argued for appellant. With him on the brief were HARRY C. MARCUS, KATHRYN A. BARRETT and JOSEPH A. FARCO. Of counsel was JAMES HWA.

DANIEL E. VALENCIA, Attorney, Office of the General Counsel, United States International Trade Commission, of Washington, DC, argued for appellee. With him on the brief were JAMES M. LYONS, General Counsel, and MICHELLE W. KLANCNIK, Assistant General Counsel.

MICHELLE K. LEE, Google, Inc., of Mountain View, California, for amici curiae, Google, Inc. and Verizon Communication Inc. With her on the brief was CATHERINE C. LACAVERA. Of counsel were MICHAEL K. KELLOGG, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., of Washington, DC, and JOHN THORNE and GAIL LEVINE, Verizon Communications Inc., of Arlington, Virginia.

_____

Before BRYSON, LINN, and REYNA, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* BRYSON. Dissenting-in-part opinion filed by *Circuit Judge* REYNA.

Bryson, *Circuit Judge.*

The appellant, which we refer to as PPC, challenges a determination by the International Trade Commission that PPC failed to prove that the importation of certain coaxial cable connectors violated section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337. The Commission ruled that PPC failed to satisfy one of the elements of a violation of section 337—the so-called "domestic industry" requirement. We affirm.

I

PPC manufactures cable connectors that are used to connect coaxial cables to electronic devices, such as cable television receivers. PPC filed a complaint with the Commission asserting that the importation, sale for importation, and sale after importation of certain coaxial cable connectors infringed four of PPC's patents and therefore violated section 337. Of the four PPC patents,

two are design patents and two are utility patents. This case involves one of the design patents, U.S. Patent No. D440,539 ("the '539 design patent"). That patent issued in 2001 and describes an ornamental design for a coaxial cable connector. The '539 design patent is a continuation of U.S. Patent Application No. 08/910,509 ("the '509 application"). One of the two utility patents, U.S. Patent No. 6,559,194 ("the '194 utility patent"), is also a continuation of the '509 application.

Section 337 makes unlawful the importation of articles that infringe a valid and enforceable United States patent, but only if a domestic industry "relating to the articles protected by the patent . . . exists or is in the process of being established." 19 U.S.C. § 1337(a)(2). The complainant can satisfy the domestic industry requirement in one of three ways prescribed by 19 U.S.C. § 1337(a)(3), which provides:

> [A]n industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent, copyright, trademark, mask work, or design concerned—
>     (A) significant investment in plant and equipment;
>     (B) significant employment of labor or capital; or
>     (C) substantial investment in its exploitation, including engineering, research and development, or licensing.

In contending that it established the existence of a domestic industry relating to the '539 design patent, PPC relies on subparagraph (C). The issue in this case is whether expenses PPC incurred in asserting and defend-

ing the validity of that patent constituted a "substantial investment in exploitation" of the '539 design patent through licensing.

PPC has granted only one license for the '539 design patent. That license was executed in early 2004 between PPC and Arris International, Inc. (formerly Antec Corporation), at the conclusion of years of litigation involving the two parties and Arris's distributor, International Communications Manufacturing, Inc. ("ICM"). PPC contends that money it spent during the years of litigation leading up to the execution of the 2004 license should be treated as an investment in licensing.

In presenting that argument, PPC relies principally on a 2001 lawsuit alleging infringement of the '539 design patent that PPC brought against Arris in the Middle District of Florida ("the Florida action"). In 2002, a jury found the '539 design patent valid and infringed, and it awarded PPC $1.35 million in damages. The court granted PPC's request for injunctive relief. Also in 2001, PPC sued ICM in the District of Colorado, again alleging infringement of the '539 design patent ("the Colorado action"). Finally, in 2003, PPC sued Arris in the Western District of Wisconsin, asserting only the '194 utility patent ("the Wisconsin action"). A jury in that case found the '194 utility patent valid and infringed. In 2004, following judgment in the Florida and Wisconsin actions, and before the Colorado action went to judgment, the parties entered into a settlement that included a license agreement. The agreement permitted Arris to practice all the patents that claim priority to the '509 application, one of which is the '539 design patent.

Based on the evidence of PPC's expenditures in that series of lawsuits, an International Trade Commission

administrative law judge found that PPC had satisfied the domestic industry requirement by establishing a "substantial investment in [the] exploitation" of the design patent by licensing. The administrative law judge ruled that at least some part of the legal expenses that PPC had incurred in enforcing the '539 design patent in the Florida action should be treated as an investment in licensing, because a portion of PPC's expenses were likely directed to settlement and licensing negotiations. The administrative law judge did not address the Colorado or the Wisconsin lawsuits. He also rejected PPC's argument that it had made a substantial investment in research and development related to the EX connector, a cable connector that PPC manufactures and distributes. As to that issue, the administrative law judge ruled that PPC had abandoned that argument and that, in any event, the argument was without merit because the EX connector was not covered by the design claimed in the '539 design patent.

The Commission reviewed the initial determination and reversed the administrative law judge's ruling that PPC had established a domestic market. The Commission noted that the term "licensing" in section 1337(a)(3)(C) encompasses not only "pre-litigation" licenses that are intended to spur production of the patented article in the first instance, but also licenses that are issued after litigation and capture royalties from existing production. The Commission acknowledged that in some circumstances enforcement-related litigation expenses may support a finding that a domestic licensing industry exists. In this case, however, the Commission found that PPC had not met its burden to show that its litigation expenses relating to the '539 design patent were related to licensing.

The Commission ruled that to permit litigation costs not shown to be licensing-related to satisfy the domestic industry requirement would effectively render the domestic industry requirement a nullity for patentees who choose to enforce their patent rights in the district courts. The consequence of so doing, the Commission stated, would be to dilute the Commission's role as a forum for resolving trade disputes.

The Commission explained that in a case such as this one, deciding whether particular litigation expenses were related to licensing and whether those expenditures were "substantial" is a fact-intensive inquiry that depends on factors such as the nature of the industry and the size of the complaining party. That inquiry would also require the fact-finder to determine whether the incurred expenses "serve to encourage practical applications of the invention or bring the patented technology to the market." The Commission remanded the case to give PPC an opportunity to show what portions of its enforcement-related expenses were related to licensing and to demonstrate that its investment in licensing was substantial.

On remand, the administrative law judge ruled that PPC had not sufficiently tied its litigation costs to licensing and that any investment that PPC had made in licensing was not substantial. While acknowledging that the issue was "a close one," the administrative law judge based his ruling on findings that PPC had received only one license, of which only a part related to the '539 design patent, that PPC had no established licensing program, and that it had made no other efforts to procure licenses for the '539 design patent. The Commission adopted the administrative law judge's remand opinion without modification, and that order became final.

II

Before turning to the merits of PPC's legal argument, we address the Commission's argument that PPC does not have standing to appeal. The Commission argues that because the only imported product that was found to infringe the '539 design patent, the Fei Yu Model No. 43 connector, was also found to infringe the '194 utility patent, PPC has suffered no injury from the Commission's decision and therefore lacks standing to appeal.

The Commission relies on our opinion in *Yingbin-Nature (Guangdong) Wood Industry Co. v. International Trade Commission*, 535 F.3d 1322 (Fed. Cir. 2008), in which we held certain claims on appeal to be moot. In *Yingbin*, the Commission found that the respondent had imported a flooring product that infringed two groups of claims in the complainant's patents, the "snap action" claims and the "lower lip" claims, each of which related to the joint between adjacent planks. Finding all other statutory requirements satisfied, the Commission entered a general exclusion order with respect to both groups of claims. The respondent appealed as to the "lower lip" claims, but not as to the "snap action" claims. We noted that because both groups of claims expired on the same day, the respondent would be in the same position regardless of how we ruled on the "lower lip" claims, so we held that the appeal as to those claims was moot. The respondent's real concern, we explained, was that the finding of infringement as to the "lower lip" claims might interfere with the respondent's subsequent efforts to redesign its product to avoid infringement. We held those concerns about the possible future effects of the Commission's ruling as to the "lower lip" claims to be too hypothetical to confer standing on the respondent to press an appeal that would have no immediate practical effect.

PPC is in a different position.  It is true that the only product that the Commission found to infringe the '539 design patent was also found to infringe the '194 utility patent.  But PPC's concerns are not related to possible future effects of the Commission's decision, as was the case for the appellant in *Yingbin*.  PPC has sought a general exclusion order relating to the '539 design patent.  The fact that a particular model of connectors—the Fei Ye Model No. 43 connectors—will be excluded regardless of the outcome of this appeal does not moot PPC's interest in obtaining the much broader relief that would be provided by a general exclusion order, which would cover all products deemed to infringe the '539 design patent.  A favorable judicial decision could therefore significantly enhance PPC's legal rights with respect to imported connectors.[1]

III

The question whether a complainant has satisfied the domestic industry requirement typically presents issues of both law and fact, but PPC's appeal raises only factual issues relating to the link between various litigation expenditures and licensing.  In reviewing the Commission's factual findings as to whether particular expenses were related to licensing and whether those expenses, when viewed in the aggregate, were "substantial," we apply the "substantial evidence" test.  *See Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1361-62 (Fed. Cir. 1999); *cf. Akzo N.V. v. Int'l Trade Comm'n*, 808 F.2d 1471,

---

[1]    PPC acknowledged before the Commission that in its experience connectors that infringed the '539 design patent also infringed the '194 utility patent, but it did not suggest that cable connectors having the ornamental design of the '539 design patent would necessarily have the cable-locking mechanism claimed in the '194 utility patent.

1486-87 (Fed. Cir. 1986) (holding that the former requirement to prove an injury to the domestic industry, which was "wed[ded] to the particular facts of each case" and was "precisely the type of question which Congress has committed to the expertise of the Commission," was subject to substantial evidence review).

## A

The domestic industry requirement appears in the original Tariff Act of 1930. The original Act, however, did not describe how a complainant could go about establishing the existence of a domestic industry. The original Act also required the complainant to show that the unfair method of competition at issue caused injury to the domestic industry and that the industry was efficiently run. In 1988, Congress disposed of the last two requirements and added what is now 19 U.S.C. § 1337(a)(3), which provides three different ways that a complainant can satisfy the domestic industry requirement. Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1342, 102 Stat. 1107, 1213.

The reports accompanying both the House and Senate versions of the 1988 amendment state that the first two ways of showing the existence of a domestic industry—by showing a significant investment in manufacturing facilities or a significant employment of labor or capital—were already being considered by the Commission. S. Rep. No. 100-71, at 129 (1987); H.R. Rep. No. 100-40, at 157 (1987). But Congress, believing the Commission's application of the domestic industry requirement had been too rigid, liberalized the domestic industry requirement by allowing that requirement to be satisfied by proof of non-manufacturing activity, such as licensing and research. H.R. Rep. No. 100-40, at 157. Nonetheless, it is clear that

Congress had no intention of disposing of the domestic industry requirement altogether; Congress recognized that the Commission is fundamentally a trade forum, not an intellectual property forum, and that only those intellectual property owners who are "actively engaged in steps leading to the exploitation of the intellectual property" should have access to the Commission. *Id.* ("The purpose of the Commission is to adjudicate trade disputes between U.S. industries and those who seek to import goods from abroad. Retention of the requirement that the statute be utilized on behalf of an industry in the United States retains that essential nexus.").

The statute does not specify whether litigation expenses incurred in enforcing a patent may later be used as evidence that the required domestic industry requirement exists. In light of the purpose underlying the 1988 amendment to section 337, the Commission reasonably concluded that expenses associated with ordinary patent litigation should not automatically be considered a "substantial investment in . . . licensing," even if the lawsuit happens to culminate in a license. To support its conclusion, the Commission pointed out that "[a]llowing patent infringement litigation activities alone to constitute a domestic industry would place the bar for establishing a domestic industry so low as to effectively render it meaningless."

We agree with the Commission that expenditures on patent litigation do not automatically constitute evidence of the existence of an industry in the United States established by substantial investment in the exploitation of a patent. We therefore disagree with the dissent's per se rule that "patent infringement litigation is an investment in the exploitation of a patent" within the meaning of section 337(a)(3)(C). Indeed, even PPC does not challenge

the requirement that it demonstrate a nexus between its litigation expenses and licensing. Instead, PPC contends that, based on its showing before the administrative law judge, it satisfied that requirement. The administrative law judge, however, disagreed and found that PPC failed to show that its litigation expenses reflected a significant investment in licensing. With respect to the Florida action, the administrative judge noted that there was no evidence that PPC had offered to license the patent to Arris before commencing litigation, no evidence that PPC had sent a cease and desist letter mentioning the possibility of a settlement, and no evidence that PPC had conducted either settlement or licensing negotiations during the lawsuit itself.

PPC argues that the administrative law judge erred in finding that it had not engaged in pre-litigation licensing efforts. In support of that contention, however, PPC merely points to vague testimony by one of its executives to the effect that PPC made efforts to settle the case. That evidence does not undermine the administrative law judge's finding that PPC failed to show that it sought to license the '539 design patent to Arris before commencing the Florida action and thus that it failed to show that the litigation expenses in that case were related to licensing. The administrative law judge was likewise entitled to disregard the statement by PPC's witness that members of the industry are generally reluctant to accept a license to a design patent and that PPC therefore viewed litigation as a necessary precursor to licensing the '539 design patent. Regardless of the state of mind of competitors in the connector industry, which may have made pre-litigation licensing more difficult, the question before the administrative law judge was whether PPC made a substantial investment in licensing, and the administra-

tive judge reasonably concluded that PPC failed to show that it did.

PPC sought and received a permanent injunction in the Florida case, and that injunction remained in place for nearly two years until PPC licensed the '539 design patent to Arris in 2004. As the Commission recognized, that delay suggests that PPC's purpose in litigating was not to obtain a license but, rather, was to stop Arris from manufacturing infringing connectors. The fact that litigation adversaries eventually enter into a license agreement does not, as PPC suggests, mean that all of the prior litigation expenses must be attributed to the licensing effort. Contrary to PPC's suggestion, the Commission did not rule that a request for or receipt of injunctive relief will always bar a patentee from later seeking to establish the existence of a domestic industry through an investment in licensing. It merely ruled that the form of relief requested is one factor that could be considered.

The administrative law judge was entitled to conclude that the Florida action expenses should not be credited as expenses related to licensing. The record evidence on pre-litigation communication regarding licensing is thin at best; PPC sought an injunction and allowed that injunction to remain in place for nearly two years, and it was not until after the Wisconsin action, which involved a different patent, that PPC granted a license to Arris. For similar reasons, the administrative law judge concluded that PPC had not shown that the expenses it incurred during the Colorado action were directed to licensing the '539 patent, and for similar reasons, we will not disturb that finding.

The Wisconsin action is fundamentally different from either the Colorado action or the Florida action because it

involved only the '194 utility patent. The administrative law judge ruled that in PPC's situation, expenses associated with the enforcement of a different patent should not be credited as an investment in licensing the '539 design patent. PPC argues that the Wisconsin jury verdict was necessary to force Arris to sign a license and that the administrative law judge should have credited more of PPC's expenses in that lawsuit toward its investment in licensing the '539 design patent. We disagree. Although the license agreement was executed after the verdict in the Wisconsin case, it does not follow that PPC's actions in the Wisconsin case were directed toward licensing the '539 design patent. In any event, the administrative law judge did not disregard the expenses of the Wisconsin litigation. He explained that once settlement and licensing negotiations began, the three actions became inextricably linked and that it made sense to consider the settlement and licensing negotiations related to all three cases in deciding whether PPC had made a substantial investment in licensing. The administrative law judge therefore examined PPC's legal bills in all three cases and credited entries that had a work description related to "licensing" or "settlement" toward PPC's investment in licensing.

PPC argues that on remand the administrative law judge failed to follow the Commission's directive that "PPC's litigation activities and costs, including any relevant costs associated with conducting settlement negotiations and then drafting and negotiating the license, may be related to licensing." Because that directive uses permissive language, such as "including" and "may," PPC argues that the administrative law judge could have credited other expenses that PPC generated during litigation and was not limited to those costs "associated with conducting license negotiations and preparing the li-

cense." The Commission directed the administrative law judge to decide which of PPC's many expenses were truly related to licensing of the '539 patent and which were not, and it suggested a flexible framework by which the administrative law judge could make that decision. In so doing, the administrative law judge reasonably relied on attorney work descriptions as he identified which expenses related to PPC's litigation activities and which related to its investment in the domestic industry through licensing.

Although the administrative law judge found that PPC had, in fact, incurred some legal expenses related to the negotiation and drafting of the licensing agreement and therefore had made at least some investment with respect to licensing of the '539 design patent, he found that the investment was not substantial. He acknowledged PPC's argument that the 2004 agreement was not reached until after PPC had filed several lawsuits against Arris and ICM on several different patents. PPC continues to press that argument on appeal and states that its expenses are sufficient to establish a significant investment in licensing. But because those cases had multiple objectives and were not all based on the '539 design patent, the administrative law judge reasonably concluded that it would be inappropriate to treat most of the incurred legal fees as an investment in licensing of the '539 design patent. We decline to disturb that ruling.

Finally, the administrative law judge pointed out that PPC had no formal licensing program and that there was no evidence it had offered to license the patent to any party other than its litigation opponents. To be sure, there is no rule that a single license—such as an exclusive license—cannot satisfy the domestic industry requirement based on a substantial investment in licensing. But

the administrative law judge was entitled to view the absence of other licenses issued or negotiated for the '539 design patent as one factor supporting his conclusion that PPC's expenditures related to licensing were not substantial. Based on the administrative law judge's thorough review of the pertinent evidence, adopted in full by the Commission, we conclude that the Commission's conclusion as to the licensing issue is supported by substantial evidence.

B

PPC also argues that the Commission should have credited at least a portion of the salary that PPC paid to the named inventor on the '539 design patent as an investment in "engineering, research and development," together with PPC's investment in the equipment and facilities that the inventor used as he developed the patented design. Although the administrative law judge had credited the inventor's salary as an investment in research and development in the initial decision, the Commission disagreed. The Commission noted that the evidence that PPC introduced as to its investment in research and development related generally to the '509 application and the '194 utility patent in addition to the '539 design patent. The Commission found that PPC had presented no evidence of any investment in research and development that related specifically to the '539 design patent, nor did it offer any allocation of its investment to that patent. In the absence of any such evidence, the Commission concluded that the most reasonable inference was that the resources that PPC invested in the inventor should be attributed nearly entirely to the "development of the structural and functional design of the connector embodied in the '509 utility application and the '194 utility patent," rather than to the development of the

ornamental design embodied in the '539 design patent. Accordingly, the Commission concluded that any time and resources spent by PPC in researching or developing the ornamental design of the '539 design patent were minimal and insufficient to constitute the "substantial" investment required by section 337(a)(3)(C).

PPC acknowledges that it had the burden of proof on that issue. It had the opportunity to identify how much of its investment in research and development related to the design protected by the '539 design patent, as opposed to the '509 family more generally, and it failed to do so. The dissent's contention that "there are no facts in the record before us sufficient to support the ITC's conclusion that time and resources spent by PPC in researching or developing the ornamental design of the '539 patent are 'minimal'" ignores that the Commission based its ruling on PPC's failure to offer evidence sufficient to satisfy its burden of proof on that issue. There is no error in the Commission's conclusion that PPC failed to carry its burden, nor is there any reason to remand for further findings on that issue, as suggested by the dissent.

**AFFIRMED**

# United States Court of Appeals for the Federal Circuit

———————————

**JOHN MEZZALINGUA ASSOCIATES, INC. (DOING BUSINESS AS PPC, INC.),**
*Appellant,*

v.

**INTERNATIONAL TRADE COMMISSION,**
*Appellee.*

———————————

2010-1536

———————————

On appeal from the United States International Trade Commission in Investigation No. 337-TA-650

———————————

REYNA, *Circuit Judge*, dissenting-in-part.

I join part II of the majority's opinion finding that PPC has standing to seek a general exclusion order with respect to the '539 patent. I respectfully dissent from the remainder of the majority opinion because I believe that additional fact-finding is needed to determine whether PPC's research and development expenditures were a substantial investment in exploitation, and because the Commission erred in its interpretation and application of § 337(a)(3)(C) resulting in its wholesale rejection of litigation expenses—except in very limited circumstances—for the purpose of meeting the "domestic industry" requirement in § 337 cases.

## I.  BACKGROUND

John Mezzalingua Associates, Inc., d/b/a PPC, Inc. ("PPC") is a domestic producer of coaxial cable connectors used in the telecommunications, satellite, and cable television industries.  PPC is headquartered in East Syracuse, New York, where a substantial portion of its employees are located, and where a substantial portion of its research, development, and commercial production take place.  Innovations within its field have enabled PPC to obtain a portfolio of utility and design patents in the United States.

PPC is a successful business that has grown and expanded in recent years, but its business has been negatively impacted by significant competition from imports of "a flood of copy-cat products" by manufacturers in China and Taiwan.  A20142-43, A20354-55, A20379-80.  For a variety of reasons, the copy-cat imports are sold at prices that severely undercut PPC's pricing.

Noah Montena joined PPC's Syracuse facility in 1997 as a product engineer and worked to develop a new product for PPC called the "EX" connector.  PPC invested a considerable sum of money in research and development that resulted in the EX connector product.  Mr. Montena's work on the EX connector also resulted in both a utility invention and an ornamental design, each of which were separately patented as U.S. Patent No. 6,558,194 ("the '194 patent" or "the utility patent") and U.S. Patent No. D440,539 ("the '539 patent" or "the design patent"), with Mr. Montena as the sole named inventor on each patent. The patented ornamental design was for a coaxial cable connector having the following appearance:



FIG. I

The record shows that PPC's attempts to license patents in its portfolio were "generally ignored" and "weren't taken seriously." A02146-99, A30043. PPC's Vice President testified that "[t]here was a general feeling in the connector industry that there was a tremendous reluctance to take any licenses." A30043. There was even more skepticism of design patents, which were previously "nonexistent in the connector industry," especially those that had never been tested in court. A30021, A00326.

On May 5, 2001, PPC sued its competitor Arris International, Inc. in the Middle District of Florida, alleging that Arris' "Digicon" connector infringed the '539 patent. The parties engaged in settlement discussions during the pendency of the Florida action, but no settlement was reached. PPC ultimately obtained a jury verdict that the '539 patent was valid and infringed by Arris, and was awarded damages and an injunction. That judgment was appealed by Arris and affirmed by this court. *John Mezzalingua Associates, Inc. v. Antec Corp.*, 81 Fed. Appx. 309 (Fed. Cir. 2003). Arris next sought to circumvent the injunction by adding labels to its Digicon connectors to conceal the infringing design, and PPC filed a contempt motion, which was denied. On December 21, 2001, PPC also sued Arris' distributor, International Communications Manufacturing Corporation ("ICM") and its owner Randall Holiday in the District of Colorado for infringe-

ment of the '539 patent by its "F-Conn" connectors supplied by Arris. Considerable sums were spent by PPC in legal fees and costs pursuing the Florida and Colorado infringement actions.

On July 1, 2003, less than two months after PPC's '194 utility patent issued, PPC sued Arris in the Western District of Wisconsin for infringement of the '194 patent by its Digicon connectors. In December of 2003, PPC received a jury verdict that Arris' Digicon connectors infringed the '194 patent, and that the infringement was willful. Within a week of the jury verdict, negotiations began to settle the outstanding lawsuits. Those negotiations resulted in a settlement agreement and separate license agreement which encompassed the '539 patent, and under which Arris, ICM, and Holliday agreed to pay money to PPC.

PPC next filed a complaint with the International Trade Commission ("ITC") under 19 U.S.C. § 337(a)(3)(C) to prevent the importation of connectors that were alleged to infringe the '539 patent, the '194 patent, and other patents owned by PPC.[1] The ITC issued its Notice of Investigation on May 30, 2008. 73 Fed. Reg. 31145. Because PPC requested a general exclusion order with respect to the '539 patent, PPC was required to make out a *prima facie* case of such entitlement, which included establishing that a domestic industry existed under Section 337. After a seven-day evidentiary hearing, the

---

[1] The eight named Respondents were Aska Communication Corp., Edali Industrial Corp., Fu Ching Technical Industrial Co., Ltd., Gem Electronics, Hanjiang Fei Yu Electronics Equipment Factory, Zhongguang Electronics, Yangzhou Zhongguang Electronics Co., Ltd., and Yangzhou Zhongguang Foreign Trade Co., Ltd.

Administrative Law Judge ("ALJ") initially determined that the '539 patent was valid and infringed by four Chinese Respondent companies that failed to participate in the investigation,[2] and that a Section 337 violation had occurred. *Certain Coaxial Cable Connectors and Components Thereof and Products Containing Same*, No. 337-TA-650, at 115-117 (Int'l Trade Comm'n October 13, 2009) ("*Initial Determination*").

The ALJ also found that PPC satisfied the domestic industry requirement based on: (1) PPC's considerable litigation expenses incurred in asserting the '539 patent against Arris in the Florida action; (2) the substantial sum of money received from Arris under the ultimate settlement and license agreement with PPC, a portion of which was attributable to the '539 patent; (3) PPC's considerable research and development costs that resulted the EX connector product, whereby "at least some portion of Mr. Noah Montena's salary, plus his time, effort and use of PPC's equipment and facilities, is attributable to his development of the design that became the '539 patent." *Id.* at 112-13.

After finding that a limited exclusion order would likely be circumvented, the ALJ recommended the issu-

---

[2]    The four Respondents located in China, Hanjiang Fei Yu Electronics Equipment Factory, Zhongguang Electronics, Yangzhou Zhongguang Electronics Co., Ltd., and Yangzhou Zhongguang Foreign Trade Co., Ltd., were all held in default for failing to answer the Complaint, and their products formed the basis for the ALJ's determinations of infringement of the '539 patent. Only Fu Ching Technical Industrial Co., Ltd. and Gem Electronics participated throughout the investigation, but the '539 patent was not asserted against them. Aska Communication Corp. and Edali Industrial Corp. were terminated from the investigation pursuant to a consent order.

ance of a general exclusion order. *Id.* at 143. The record shows that this recommendation was based largely on the business practices utilized by the Chinese Respondents, such as having overlapping locations, personnel, and operations. The ALJ explained that "in China, the licensing system makes it very common and inexpensive for individuals or families to operate Chinese companies under a number of different names." *Id.* at 122. The ALJ observed that lack of clarity as to the precise relationship among the four Respondents having demonstrated commonalities was indicative of the ease with which Chinese entities could establish new companies and continue to import infringing compression connectors if barred only by a limited exclusion order. *Id.* at 142-43. A PPC corporate representative testified that if PPC were able to identify and assert its patent rights against one such Chinese importer, it would be easy for that company to circumvent patent enforcement efforts: "In many cases, they would just pick up the operation and move, change the name of the company, take out a new business license, and be manufacturing within a relatively short period" of about two weeks. *Id.* at 123. PPC's counsel characterized this predicament as follows:

> These [Respondents] are defaulters that we engaged in the ITC . . . companies that didn't even appear, and the district courts are not too helpful for such infringers. They won't show up. They won't obey injunctions. They will appear in a different guise with a different name, with a knock-off product.

Oral Arg. at 13:28 – 14:27.

Upon review of the ALJ's initial determination the ITC reversed, finding that the simultaneous investment

in engineering, research, and development of PPC's EX connector was not attributable to the design of the connector, but rather was directed to the underlying functionality. *Certain Coaxial Cable Connectors and Components Thereof and Products Containing Same*, No. 337-TA-650, at 52-53 (Int'l Trade Comm'n March 31, 2010) ("Without a showing to the contrary, we find that Mr. Montena's salary, time, effort, and use of PPC's equipment and facilities are more likely attributable to his development of the structural and functional design of the connector . . . than to his development of the ornamental design.") ("*Comm'n Op.*"). Regarding litigation and licensing activities in general, the ITC determined that

> We conclude that patent infringement litigation activities alone, i.e.*,* patent infringement litigation activities that are not related to engineering, research and development, or licensing, do not satisfy the requirements of section 337(a)(3)(C). However, litigation activities (including patent infringement lawsuits) may satisfy these requirements if a complainant can prove that these activities are related to licensing and pertain to the patent at issue, and can document the associated costs.

*Id.* at 43-44. As to PPC's asserted litigation expenses and licensing activities in particular, the Commission found that the record was insufficient to determine whether the required nexus had been shown and what the associated litigation costs were, and remanded to the ALJ for additional fact finding. *Id.* at 54.

On remand the ALJ concluded that PPC's settlement and license agreement had a sufficient nexus with the

litigation, but that only the attorney time billed specifically for settlement negotiations and license agreement preparation could constitute "investments" in licensing under Section 337(a)(3)(C). *Certain Coaxial Cable Connectors and Components Thereof and Products Containing Same*, No. 337-TA-650, at 8-13, 19, 24 (Int'l Trade Comm'n May 27, 2010) ("*Remand Determination*"). The sum of those particular legal expenditures was considerably smaller than the total litigation expenses, and would need to be further discounted to reflect the portion of the billable time that was spent on the '539 patent as opposed to other patents or other matters. *Id.* at 19-25. The ALJ found this lesser amount to be an insufficient investment in patent licensing activities to show the existence of a domestic industry, and therefore no § 337(a)(3)(C) violation was found. *Id.* at 25. The ITC declined to review the ALJ's determinations on remand, and this appeal followed. *Certain Coaxial Cable Connectors and Components Thereof and Products Containing Same*, No. 337-TA-650, at 1-2 (Int'l Trade Comm'n July 12, 2010).

## II.  DISCUSSION

The ITC's Final Determination is reviewed in accordance with the Administrative Procedure Act. *See Honeywell Int'l, Inc. v. ITC,* 341 F.3d 1332, 1338 (Fed. Cir. 2003). This court must set aside any findings or conclusions of the ITC that are "arbitrary, capricious, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The ITC's legal conclusions are reviewed *de novo. Honeywell*, 341 F.3d at 1338.

Statutory interpretation by the ITC is a legal issue reviewed *de novo*, except to the extent deference to the ITC's construction of a statute it administers is required under the two-step analysis set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S.

837 (1984). *NSK Ltd. v. United States*, 390 F.3d 1352, 1354 (Fed. Cir. 2004). The ITC's interpretation must be set aside if is it is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844.

## A.  PPC's Investment in Engineering, Research, and Development

The ITC determined that although PPC had made considerable investments in the engineering, research, and development of its EX connector, the investment was directed solely to the underlying functionality of the connector, and therefore could not support a finding of domestic industry with respect to a patented design that arose out of the very same effort. No apportionment or weight was given to PPC's research and development regarding the design. *See Comm'n Op.* at 52-53.

The ITC emphasized the following findings: the '539 design patent and the '194 utility patent include the same drawing figures; both patents were filed as continuations of a single prior application; and PPC has not made any product covered by its '539 patent. *Id.* Based on these findings, the ITC concluded that "Mr. Montena's salary, time, effort, and use of PPC's equipment and facilities are more likely attributable to his development of the structural and functional design of the connector . . . than to his development of the ornamental design." *Id.* This conclusion was arbitrary and capricious.

First, the ITC's analysis regarding PPC's research and development expenditures was cursory and arbitrary. The ITC suggests that "without a showing to the contrary," a design patent that was based on an underlying utility application having the same drawing figures renders the design a mere incidental afterthought to which no amount of investment or effort can be attrib-

uted. *Id.* Since the ITC does not base its reasoning on any evidence or testimony as to the work done by the inventor of the connector and creator of the design, its determination that such a patent application filing strategy must reveal that the design was essentially valueless was speculative. This decision arbitrarily diminishes the availability of section 337 relief with respect to design patents and undermines the value of design patents generally. Design patents possess unique and valuable properties long ago recognized by the Supreme Court. *See Gorham Co. v. White*, 81 U.S. 511, 524-25 (1871) ("The law manifestly contemplates that giving certain new and original appearances to a manufactured article may enhance its salable value, may enlarge the demand for it, and may be a meritorious service to the public."). Design patents protect fundamentally different subject matter than that which is encompassed by a utility patent, and can be used to effectively and efficiently combat knock-off products that can be easily identified by visual inspection alone.

Second, that PPC has not made and sold products covered by the '539 patent is not a reasonable basis to entirely discount PPC's research and development of the design. It is clear that Mr. Montena's work yielded a functional connector invention and an ornamental design for it. Some non-zero portion of Mr. Montena's time and effort was necessarily devoted to the ornamental aspects of the connector. It was arbitrary for the ITC to assume that this portion was *de minimis* and insubstantial because PPC did not ultimately put the design into one of its commercial products. PPC may have had good business reasons for not including the patented design in its products. The mere non-use of the design cannot justify a total disregard of the related underlying investment in research and development of it.

Third, the ITC should be wary of diminishing the contribution of an ornamental design particularly where, as here, the inventor/designer's effort yields both functional and ornamental features applicable to the same underlying article. The result may be greater than the sum of its parts, and the parts may not be easily separable. *See* Perry J. Saidman & Theresa Esquerra, *A Manifesto on Industrial Design Protection: Resurrecting the Design Registration League*, 55 J. COPYRIGHT SOC'Y USA 423, 425 (2008) ("Since a good industrial design ideally inseparably blends form and function, the designer is penalized [by the functionality doctrine] because her design embodies functional qualities."). Patentable designs are by definition embodied in underlying utilitarian articles. *See* 35 U.S.C. § 171 ("Whoever invents any new, original, and ornamental design *for an article of manufacture* may obtain a patent therefore . . . .") (emphasis added). Whether or not that underlying article embodies a separately patentable utility invention, the utility of the article itself cannot be presumed to completely overshadow the investment in research and development of the article's design.

The majority argues that no remand is necessary because the ITC found PPC failed to meet its burden of proof on the issue of investment in research and development of the patented design. *See Comm'n Op.* at 52 ("PPC presented no evidence of any investment in research and development related to the '539 patent."). While PPC did not affirmatively apportion out its investment as it pertained to the '539 design patent only, PPC introduced substantial evidence showing its considerable investment in the EX connector research project as a whole, which necessarily included the work that yielded the patented design. The ALJ considered all the evidence and found it sufficient to show that "at least some portion

of Mr. Montena's salary, plus his time, effort, and use of PPC's equipment and facilities, is attributable to his development of the design that became the '539 patent." *Initial Determination* at 113. The ITC rejected "[t]his inference," and instead would have required some better or more precise allocation of investment costs to show direct attribution to the design. *Comm'n Op.* at 52-53. Without first verifying the possibility and extent to which such an allocation can be made, there are no facts in the record before us sufficient to support the ITC's conclusion that time and resources spent by PPC in researching or developing the ornamental design of the '539 patent are "minimal" and could not constitute a substantial investment. *Comm'n Op.* at 52-53. This conclusion is not a cost allocation but mere conjecture. The ITC's determination that PPC's research and development with respect to the design patent failed to meet a substantial investment threshold was therefore arbitrary and capricious. Remand is necessary to conduct further fact finding as to the extent to which PPC's research and development efforts may be allocated between the functional and ornamental features created by Mr. Montena.

## B. PPC's Investment in Exploitation

Section 337(a)(3)(C)'s applicability to litigation expenses is an issue of first impression before the ITC and before this court. The ITC correctly characterized PPC's asserted litigation expenses as "rais[ing] an important issue of statutory interpretation," namely, "whether litigation activities can constitute 'exploitation' under section 337(a)(3)(C)" so as to support a finding of a domestic industry. *Comm'n Op.* at 41, 43. As noted above, the ITC answered that question as follows:

> We conclude that patent infringement litigation activities alone, i.e., patent infringement litigation activities that are not related to engineering, research and development, or licensing, do not satisfy the requirements of section 337(a)(3)(C). However, litigation activities (including patent infringement lawsuits) may satisfy these requirements if a complainant can prove that these activities are related to licensing and pertain to the patent at issue, and can document the associated costs.

*Id.* at 44. This interpretation of § 337(a)(3)(C) is to be reviewed *de novo*, since no deference is owed to the ITC under *Chevron* in this instance.[3]

---

[3]     Statutory construction was well briefed at ITC, and was a critical and dispositive element of the ITC's decision. *Comm'n Op.* at 41-51. PPC's declining to affirmatively raise this issue again on appeal therefore does not foreclose this court from addressing this "pure question of law that cries out for resolution." *See Rybarczyk v. TRW, Inc.*, 235 F.3d 975, 984 (6th Cir. Ohio 2000) ("Failure to raise an issue on appeal would normally constitute a waiver of that issue. Here, however, we have a pure question of law that cries out for resolution - and in such a situation we are not foreclosed from considering the issue.") (citation omitted); *see also United States v. Carlson*, 900 F.2d 1346, 1349 (9th Cir. 1990) (explaining that a court may reach questions otherwise not properly before it where "the issue presented is purely one of law and the opposing party will suffer no prejudice as a result of the failure to raise the issue"). While the majority frames the issue before this court as "relat[ing] to the sufficiency of its evidence linking various litigation expenditures to licensing," that view assumes that the ITC correctly interpreted section 337(a)(3)(C) to require such a nexus between litigation and licensing. It is therefore necessary to address the ITC's interpretation of section 337(a)(3)(C),

The original Tariff Act of 1930 required a showing of domestic industry, as well as an independent showing of injury to that domestic industry, to bring a successful claim under section 337.  *See, e.g.*, *Akzo N.V. v. ITC*, 808 F.2d 1471, 1486-87 (Fed. Cir. 1986) ("[T]o prove a violation of § 337, the complainant must show both an unfair act and a resulting detrimental effect or tendency.").  In 1988 Congress eliminated the injury requirement and added what is now section 337(a)(3) to specify how a domestic industry may be established.  At that time the ITC was already finding a domestic industry to be shown via manufacturing activity such as investment in manufacturing infrastructure or employment of labor or capital. S. REP. NO. 100-71, at 129 (1987); H.R. REP. NO. 100-40, at 157 (1987).  Believing that the ITC was too rigidly requiring such manufacturing activity, Congress considerably lowered the domestic industry requirement threshold by permitting non-manufacturing activity such as licensing and research to show the existence of a domestic industry. H.R. REP. NO. 100-40, at 157.  Thus, the following text of section 337(a)(3) was enacted:

> an industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent, copyright, trademark, mask work, or design concerned—
>
> (A) significant investment in plant and equipment;
>
> (B) significant investment in labor or capital; or

---

as the statutory construction question forms the true basis of the dispute before this court.

        (C) substantial investment in its exploita-
            tion, including engineering, research
            and development, or licensing.

19 U.S.C. § 1337(a)(3).

Under *Chevron* we must first look to whether Congress has directly spoken to the issue of whether litigation activities can alone support a finding of a substantial investment in exploitation under § 337(a)(3)(C). 467 U.S. at 842-43. Neither party contends that Congress has directly addressed this precise issue. Indeed, the plain language of § 337 is silent as to how litigation or patent enforcement expenses should be treated.

In the legislative history of the 1988 amendment to section 337, Congress was clear that "[t]he mere ownership of a patent . . . would not be sufficient to satisfy [the domestic industry requirement]. The owner of the property right must be actively engaged in steps leading to the exploitation of the intellectual property, including application engineering, design work, or other such activities." S. Rep. No. 100-71, at 130. Congress gave examples of universities or small startup companies "licensing their rights to manufacturers" as acceptable kinds of domestic industries. *Id.* at 129; *Comm'n Op.* at 47-48. Although Congress clearly intended to require something more than mere ownership of a patent, it did not exclude litigation activities as indicia of being actively engaged in the exploitation of the patent. The question then becomes whether the ITC's interpretation to exclude litigation expenses not tied to licensing was a permissible construction, i.e., one which is not "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 842-44.

The ITC conceded that the plain language of section 337(a)(3)(C) does not limit the kinds of activities that can be considered exploitation, but rather provides an exemplary listing of activities that can constitute exploitation. *Comm'n Op.* at 45; 19 U.C.C. § 1337(a)(3)(C). Nevertheless, the ITC "decline[d] . . . to venture beyond these three examples because we are not convinced that patent infringement litigation activities unrelated to engineering, research and development, or licensing constitute 'exploitation' for purposes of the statute." *Comm'n Op.* at 45. It emphasized that "Congress could have easily included patent infringement litigation [in the list], but did not." *Id.* at 45. Furthermore, the ITC believed that "[a]llowing patent infringement litigation activities alone to constitute a domestic industry would place the bar so low as to effectively render it meaningless," and Congress plainly intended for more than mere ownership of patent right to suffice. *Id.* at 46. Hence, the ITC announced a litigation-licensing nexus rule. *Id.* at 50.

The ITC's interpretation of section 337(a)(3)(C) is unduly narrow, and is "manifestly contrary to the statute." *Chevron*, 467 U.S. at 842-44. Congress did not enact language that limited the term "exploitation" to activity only related to one of the named examples listed in the statute. Congress left the list open-ended to provide flexibility for what may be deemed to constitute exploitation, expressing that criteria other than the examples would appropriately qualify for consideration. *See* § 337(a)(3)(C) ("exploitation, *including* engineering, research and development, or licensing") (emphasis added); *see also* S. REP. NO. 100-71, at 130 (1987) (discussing the consideration of "engineering, design work, *or other such activities*") (emphasis added). The ITC failed to articulate any reasonable basis in the legislative history—let alone an "extraordinary showing of contrary inten-

tions"—to justify such a departure from the plain meaning of the statutory language. *See Garcia v. United States*, 469 U.S. 70, 75 (1984). The legislative history compels that "exploitation" be read broadly in accordance with the statutory text. *See* S. REP. NO. 100-71, at 130. The ITC's construction artificially and arbitrarily narrowed the domestic industry requirement.

The majority misapprehends the threshold domestic industry requirement through its perception that the ITC is "fundamentally a trade forum, not an intellectual property forum." This view ignores the statutory role of the ITC and the legislative purpose of section 337, and tends to place an undue expectation of trade-related or production-related activity when analyzing the domestic industry requirement. The ITC took a similar view of itself and of section 337, suggesting that "exploitation" is shown only by "taking steps to foster propagation or use of the underlying intellectual property" or by engaging in "activities that serve to encourage practical applications of the invention or bring the patented technology to market." *Comm'n Op.* at 49. As this court has observed, however, "[w]hen Congress amended section 337 of the Tariff Act of 1930 in 1988 to provide the definition of domestic industry now found in subsection (a)(3), it stated that its purpose was 'to make [section 337] a more effective remedy for the protection of United States *intellectual property rights*.'" *Texas Instruments Inc. v. ITC*, 988 F.2d 1165, 1181 (Fed. Cir. 1993) (quoting Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1341(b), *reprinted in* 1988 U.S.C.C.A.N. (102 Stat.) 1107, 1212 (codified at 19 U.S.C. § 1337)) (emphasis added). Thus when Congress amended § 337 it revised the standing requirement to eliminate the need to show material injury, a factor that is plainly trade-related, and thereby charged the ITC with administering a statute having a

primary purpose of enforcing valid intellectual property rights. *See* Thomas A. Broughan, III, *Modernizing § 337's Domestic Industry Requirement for the Global Economy*, 19 FED. CIR. B.J. 41, 79 (2009) ("The statute requires the ITC to consider the health and public welfare and competitive conditions in balancing the interests of U.S. consumers against those of owners of intellectual property . . . ."). Subsequent to the 1988 amendment, the number of actions for enforcement of intellectual property rights against infringing imports have increased and become the most prominent of complaints brought before the ITC. *See* William P. Atkins & Justin A. Pan, *An Updated Primer on Procedures and Rules in 337 Investigations at the U.S. International Trade Commission*, 18 U. BALT. INTELL. PROP. L.J. 105, 107 (2010) ("Section 337 has evolved almost exclusively into an intellectual property enforcement statute."); Joel W. Rogers & Joseph P. Whitlock, *Is Section 337 Consistent with the GATT and TRIPS Agreement?*, 17 AM. U. INT'L L. REV. 459, 470-471 (2002) ("Section 337 is a powerful border enforcement mechanism to be used against imports that infringe a U.S. patent . . . . Section 337 is often used for intellectual property claims instead of other 'unfair methods of competition' claims."). I disagree with both the ITC and the majority in that with regard to section 337 investigations, I view the ITC as an intellectual property enforcement forum.

In its capacity as an administrator of an important intellectual property enforcement statute, it is error for the ITC to limit the scope of its section 337 investigations to those where the complainant is involved in traditional trade-based or goods-based activities. The ITC must understand that patentees have no affirmative right to practice their inventions, but only the right to exclude others from doing so. *TransCore, LP v. Elec. Transaction*

*Consultants Corp.*, 563 F.3d 1271, 1275 (Fed. Cir. 2009). A patent right is therefore empty without the ability to meaningfully enforce it against infringers. Congress recognized this fact when it added section 337(a)(3)(C) to give patentees "more effective" means to enforce their rights. *Tex. Instruments*, 988 F.2d at 1181. By permitting patent rights to be more effectively enforced at the border, Congress again advanced the axiom that enforceable patent rights are good for innovation and for the economy. *See Hilton Davis Chem. Co. v. Warner-Jenkinson Co., Inc.*, 62. F.3d 1512, 1529 n.1 (Fed. Cir. 1995) (Newman, J., dissenting) ("Technologic innovation has driven the American economy, over the past century, to the exclusion of virtually all other growth factors . . . . [P]atent-based innovation has a positive impact on the economic system as new industries and new goods displace the old."); Andrew Beckerman-Rodau, *Patents are Property: A Fundamental But Important Concept*, 4 J. BUS. & TECH. L. 87, 93 (2009) ("Absent the ability to assert patent property rights, fewer inventions will be patented and the public storehouse of knowledge will decrease without the public disclosure from those patents."); *see also* 35 U.S.C. § 271(a) (deeming importation of a patented article to constitute infringement). Conversely, the incentive for domestic producers to innovate is all but destroyed if their patents are being infringed by foreign companies that vanish at the first sign of legal opposition to their importation or domestic sales, only to later resurface under a new name with more infringing products. For such situations, Congress made meaningful relief available to patentees by enabling the ITC to issue exclusion orders to stop infringement at the border. As shown in PPC's case, there exists strong motivation for infringers to circumvent U.S. patent enforcement efforts, a circumstance that can only be effec-

tively addressed through the issuance of a general exclusion order. *Initial Determination* at 143.

Although standing for such exclusionary relief requires activity beyond "mere ownership" of a patent, S. REP. NO. 100-71, at 130, Congress deemed that standing could exist via any "exploitation" of the patent—i.e., any activity that puts the patent to a productive use or otherwise takes advantage of it. *See Williams v. Taylor*, 529 U.S. 420, 431 (2000) (explaining that Congress is presumed to have intended each word in a statute would be given its "ordinary, contemporary, common meaning"); *Comm'n Op.* at 49 (finding that when Congress amended section 337 in 1988, to "exploit" meant "to put to a productive use" or "to take advantage of"). This threshold is intentionally very low, in keeping with Congress' goal to make section 337 a more effective patent enforcement statute. Indeed, a patentee need not even be engaged in the exploitative activity *per se* as long as its activity is an "*investment in* [the patent's] exploitation." § 337(a)(3)(C) (emphasis added). A domestic industry can be shown to exist by those "actively engaged in *steps leading to the exploitation* of the intellectual property." S. REP. NO. 100-71, at 130 (emphasis added). Under the broad language of section 337(a)(3)(C), patent infringement litigation is an investment in the exploitation of a patent.

Securing a judgment of validity and infringement substantially strengthens and increases the value of the patent. *See* John R. Allison et al., *Valuable Patents*, 92 Geo. L.J. 435, 439-440 (2004) ("[L]itigated patents tend to be much more valuable than others on average . . . ."). Stronger patent rights are also better able to attract investment to support an industry and provide higher returns on those investments. *See* Mark A. Lemley, *The Economics of Improvement in Intellectual Property Law,*

75 TEX. L. REV. 989, 994 (1997) ("[I]ndividuals will not invest in invention or creation unless the expected return from doing so exceeds the cost of doing so—that is, unless they can reasonably expect to make a profit from the endeavor."). In these ways, infringement litigation can be a productive and advantageous use of patent rights which better fortify the patentee's position in the marketplace. Indeed, it appears that absent PPC's infringement actions the '539 patent would never have become sufficiently valuable or marketable for PPC to have obtained the license agreement that it did. The infringing competitors only stopped infringing and licensed PPC's patents at the point of a sword forged and tempered in the district courts.

When faced with a flood of infringing "copy-cat" imports able to undercut their prices, it is unreasonable that entities like PPC be discouraged from first enforcing a patent in litigation in lieu of producing the patented article to compete in the marketplace while at a clear economic disadvantage. Likewise, when an industry is highly reluctant to license patents in the relevant technological field, a patentee should be able to pursue litigation as an alternative or precursor to licensing negotiations without diluting its patent rights. Litigation in these contexts constitutes an investment in exploitation. Entities that are or can become market participants in the field of the patented technology should not be deemed to lack standing for a section 337 action if those entities have substantially staked out their claim to the technology via infringement litigation.

Litigation undertaken to enforce patent rights and enhance the value of a patent or pave the way for a stronger competitive advantage constitutes an investment in exploitation under section 337(a)(3)(C), regardless of

that activity's relationship to licensing, engineering, research, or production. Here, the ITC's determination to exclude litigation costs untethered to licensing from consideration has impermissibly and arbitrarily limited the reach of section 337 for patent owners.

### III. CONCLUSION

For the foregoing reasons, I would reverse the ITC determination and remand for additional fact finding as to how much investment PPC made into the research and development of the design, and to determine whether PPC's infringement litigation costs, alone or in combination with its research and development costs, are substantial enough to give rise to the existence of a domestic industry.